UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES,

      Plaintiff,

v.

FERNANDO AGUILERA,

      Defendant.

No.  CR 23-00217   WHA

**ORDER DENYING MOTION TO SUPPRESS**

## INTRODUCTION

In this 18 U.S.C. § 922(g)(1) prosecution, defendant moves to suppress evidence obtained by police as a result of his capture.  For the reasons stated below, the suppression motion is **DENIED**.

## FINDINGS OF FACT AFTER EVIDENTIARY HEARING

On April 7, 2023, SFPD received two ShotSpotter alerts in our Mission District:  the first for one shot at 1:55 a.m., and the second, for four shots, four minutes later.  The alerts originated near El Trebol Bar, located on the southeast corner of 22nd and Capp Streets in San Francisco (marked "T" in the figure below).

Two 911 calls were also received by dispatch at 1:59 and 2:01 a.m.  The first reported three gunshots at the intersection of 23rd and Capp Streets.  The second reported the sound of four gunshots at the intersection of 22nd and Capp Streets, and the appearance of an individual with a limp moving east on 22nd Street, with a sedan following closely behind.

Officers Victoria Grech and Adrian Hurtado arrived on 22nd Street, between El Trebol Bar and Van Ness Avenue, at about 2:01 a.m.  Two individuals immediately approached their

United States District Court
Northern District of California

United States District Court
Northern District of California

patrol vehicle.  One, later identified as H. Briseno, approached Officer Hurtado's passenger-side window and began speaking with him.  Sometime after the conversation started, Officer Hurtado activated his body camera and stepped out of the vehicle to address Briseno.  As a result, some portion of what Briseno said was not captured by Hurtado's body camera audio.  Briseno told Officer Hurtado that he saw a Hispanic male wearing a blue jacket fire three shots into the air, and then proceed westbound down 22nd Street.  Officer Hurtado began to head down 22nd Street, and as he approached El Trebol bar, he related Briseno's tip to Officers James Frisk and Gregory Foote, also on the scene immediately outside El Trebol.

Officer Hurtado continued westward with Officers Frisk and Foot in tow, and as he cleared El Trebol and stepped into the intersection of 22nd and Capp Streets, an anonymous woman to his left, "Jane Doe," pointed further west down 22nd Street and said that "he went that way" (in Spanish, employing a gender-ambiguous phrasing that did not necessarily identify the person as male).  Hurtado saw someone walking in the direction indicated by Briseno and Doe, pointed at him, and turned to tell Officers Frisk and Foote, "that guy, it's going to be that guy."

Officer Frisk, just a step behind Hurtado, caught sight of the suspect and radioed in, "our suspect is heading northbound on Mission right now, he just hung a left from 22nd street, getting pointed out by a 909 [police code for eyewitness]."  A left from 22nd would take the suspect southbound, not northbound, so the initial comment was partly in error.  However, Officer Frisk set the record straight moments later.  As Officer Grech's vehicle approached the trio in the intersection of Capp and 22nd, Officer Frisk approached her driver-side window and told her that "he went over there, *he's on the left side,  he's on the left side over there* . . . he's gonna be on the east sidewalk."

As Officer Frisk brought Officer Grech up to speed, Officer Hurtado made his way back into the cruiser.  Before climbing in, Officer Hurtado briefly pointed back towards Briseno because Officer Frisk asked, "where's our 909 who pointed it out?"  Hurtado then relayed the suspect's description to Grech as she took off down 22nd Street (the approximate path of their pursuit of the suspect, first by car, then on foot, is marked by a red dotted line in the figure

2

below).  As Officer Grech approached Mission she confirmed once more, "hooked a left?" before doing the same.

Driving on Mission, Officers Hurtado and Grech saw two people.  Officer Grech, referring to the first, asked "this guy?"  Officer Hurtado responded, "no, no, no, that guy over there," and pointed to a second person further down Mission, walking away from the scene of the crime.  Officer Grech moved her cruiser into the path of the suspect, the officers exited the vehicle, identified themselves, and ordered the suspect to stop, yelling "hey! Get on the ground! Police! Stop!" (marked "S" in the figure below).  The suspect took off running southbound on mission.

Officer Hurtado gave chase on foot.  While the two moved southbound on Mission, the suspect turned towards Hurtado and "punched his arm out" in what Officer Hurtado believed to be a shooting motion.  Officer Hurtado ducked behind a trashcan briefly, losing sight of the suspect.  He then resumed the chase, following the suspect west down 23rd Street until again losing sight of him at the intersection of 23rd and Bartlett, heading north (marked "X" in the figure below).  Officer Hurtado was at one time as little as five feet from the suspect.

Officer Grech caught up to Officer Hurtado at the intersection of 23rd and Bartlett, Hurtado got back in the cruiser, and the two drove up Bartlett to 22nd Street.  Officer Grech broadcast that the suspect was hiding somewhere on Bartlett between 22nd and 23rd.  The two exited the cruiser and, alongside several other officers, doubled back towards 23rd Street on foot, scanning the shadows with flashlights.  Officer Hurtado used the momentary lull in the action to disseminate an expanded description of the fleeing suspect:  "Hispanic male, dark skin, long hair, blue jacket, and jeans, and black shoes."  That description was then broadcast to the rest of the search party by another officer.

As Officers Grech and Hurtado worked their way back down to Bartlett and 23rd, Officers Frisk and Foote arrived at the intersection in a patrol car.  Officer Frisk approached a witness (later identified as "B.M.") standing in the doorway of the restaurant at the southeast corner of the intersection and asked her if she saw where "the guy that was running went to."

3

After a brief conversation in Spanish, Officer Frisk turned around, pointed to the white house on the northeast corner of the intersection, and stated, "he's supposedly there!"

Officer Hurtado arrived at the intersection at that moment, and Officer Frisk asked him to clarify B.M.'s tip with her: "Hey, can you get [ ] what she was saying? There's a word I didn't understand, he's in the white *something*." Witness B.M. told Officer Hurtado that she saw a man run to the intersection, attempt to hide by a parked car, and then relocate behind the white *fence* at the northeast corner. She confirmed that the man was still hiding there.

A few seconds later, Officer Frisk peered through a large gap in that fence, shined his flashlight directly at defendant, and spotted him lying in the weeds (at "X" in the figure below). Officer Frisk pointed his sidearm at defendant as the latter lay prone, and several officers began to shout instructions. In the course of displaying his hands, defendant discarded the firearm in question in this prosecution.

The ShotSpotter alerts came in at 1:55 a.m. and 1:59 a.m. and defendant was seized at 2:08 a.m., roughly two blocks from the location of the alerts.

All factual statements in this order, wherever located, are intended as findings of fact. This order follows a first round of full briefing and oral argument, a two-day evidentiary hearing, and a second round of full briefing and oral argument.



*The Area Surrounding El Trebol Bar.*

# ANALYSIS

1.    **OFFICERS' SEIZURE OF DEFENDANT WAS SUPPORTED BY REASONABLE SUSPICION.**

Defendant seeks to suppress all fruits of his seizure and search, arguing that officers lacked reasonable suspicion to seize him.  Defendant was seized when he came to the attention of Officer Frisk, who trained his weapon on defendant and began to shout "hands."  Half a dozen officers quickly followed suit.  No reasonable person would have felt free to decline the request, and defendant submitted without resistance.

The Fourth Amendment permits an officer to conduct an investigatory stop or seizure if that officer has "a particularized and objective basis for suspecting the particular person stopped of criminal activity."  *United States v. Cortez*, 449 U.S. 411, 417-18 (1981).  Our court of appeals has laid out the standard as follows:

> Reasonable suspicion is defined as a particularized and objective basis for suspecting the particular person stopped of criminal activity.  The reasonable-suspicion standard is not a particularly high threshold to reach.  Although a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.  Reasonable suspicion is a commonsense, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.  Protection of the public safety justifies such an approach.  When reviewing an officer's reasonable suspicion, we must look at the totality of the circumstances.

*United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (cleaned up).  Reasonable suspicion is determined in view of the facts known to officers at the time of the arrest – not those subsequently discovered.  *Florida v. J.L.,* 529 U.S. 266, 271 (2000).  "Under the collective knowledge doctrine, we must determine whether an investigatory stop, search, or arrest complied with the Fourth Amendment by looking to the collective knowledge of all the officers involved in the criminal investigation although all of the information known to the law enforcement officers involved in the investigation is not communicated to the officer who actually undertakes the challenged action."  *United States v. Ramirez*, 473 F.3d 1026, 1032 (9th Cir. 2007) (cleaned up).  Officers are deemed to be working together for the purposes of

United States District Court
Northern District of California

1    the collective knowledge doctrine where there has been some communication among agents,

2    "regardless of whether any information giving rise to probable cause was actually

3    communicated to the officer conducting the stop." *Ibid*.  (cleaned up).

4        It is clear, when viewing the totality of the circumstances, that defendant was not stopped

5    on the basis of an "inchoate and unparticularized opinion or 'hunch.'"  *Terry v. Ohio*, 392 U.S.

6    1, 28 (1968).

7        Stepping back to the Mission Street encounter, Officers had sufficient reasonable

8    suspicion to justify the stop of the suspect fleeing southbound on Mission street.  Officers

9    arrived at El Trebol Bar in response to four separate reports of gunshots received minutes

10   before: two through ShotSpotter, and two through 911.  Witness Briseno said he saw the

11   shooter – a Hispanic male wearing a blue jacket – fire into the air and head westbound down

12   22nd Street.  A second person outside El Trebol pointed officers in the same heading and said

13   that "they went that way."  Both Officers Hurtado and Frisk saw an individual walking away in

14   that direction.  Officer Frisk reported seeing the suspect turn left onto Mission Street.  Officers

15   Grech and Hurtado took off after the suspect in their police cruiser.  When they turned left onto

16   Mission, Officer Hurtado confirmed that one of the two people within view matched the

17   description provided by Briseno.  Officer Grech stopped her vehicle near the suspect, and the

18   two exited and ordered the suspect to stop and get on the ground.  The suspect took off in

19   headlong flight, and Hurtado followed close behind.

20       It is clear, in light of the above, that officers possessed the requisite suspicion to chase

21   and try to stop the suspect.  Indeed, they possessed a great deal more suspicion than officers

22   did in *Wardlow*, for example, where arresting officers were armed with little more than

23   unprovoked flight in a high crime area.  Here, officers were responding to reports of a specific

24   crime, were given a description of the suspect by an eyewitness, and came upon a matching

25   suspect in close physical and temporal proximity to the crime at issue.  That individual fled

26   from police after an order to stop.

27       Officer Frisk's seizure of defendant behind the white fence was likewise supported by

28   reasonable suspicion.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*First*, the fact that defendant was found exactly where the fleeing suspect was last seen supports reasonable suspicion. At about 2:04 a.m., Officer Hurtado pursued the suspect to the intersection of 22nd and Bartlett, where he lost sight of the suspect as the latter turned right onto Bartlett Street. Officer Hurtado broke off the chase immediately outside of a restaurant on the southeast corner of the intersection and re-entered Officer Grech's vehicle, which had just caught up with him. Officer Grech broadcast that the suspect was hiding on Bartlett Street, somewhere between 22nd and 23rd.

At about 2:08 a.m., B.M., inside the restaurant on the southeast corner of the intersection of Bartlett and 23rd, informed police that she saw "the guy that was running" run to the intersection, attempt to hide by a parked car, and then relocate behind the white fence at the northeast corner of the intersection, and further confirmed that the man was still hidden there. Defendant was found seconds later behind that very fence.

*Second*, the fact that defendant was found attempting to conceal himself further supports reasonable suspicion. "[E]vasive behavior is a pertinent factor in determining reasonable suspicion." *Wardlow*, 528 U.S. at 124. An individual is free to go about their business in the presence of police officers. *Ibid.* And no one is obligated to make their presence known to the police, or to aid them in their search. Here, however, defendant was not merely going about his business. The narrow strip of weeds in question, sandwiched between a half-wall and fence on one side, and the sidewall of a private home, was scarcely wide enough to allow defendant to lay flat. Defendant was found prone underneath various electrical boxes and meters, their attendant wires, and a bay window that spans nearly the entire width of the patch in question. Laying prone under meters and wires in a fenced off, narrow bed of weeds at 2 a.m. on a wet San Francisco morning is the kind of "evasive behavior" that is pertinent to a reasonable suspicion determination.

*Third*, the appearance of defendant supported reasonable suspicion. As an initial matter, this order must address an inconsistency in the record related to the appearance of the fleeing suspect. After their foot chase, Officer Hurtado disseminated an expanded description of the suspect: "Hispanic male, dark skin, long hair, blue jacket, uh, and jeans, and black shoes"

1   (Exh. B at 5:00 – 5:18; Tr. 100 – 101).  Nevertheless, Officer Hurtado's body camera video

2   clearly shows that the suspect was in fact wearing tan shoes, and that Officer Hurtado

3   misreported that detail (Exh. 16).  On cross-examination, Officer Hurtado testified that he did

4   not recall that the suspect was wearing black shoes, but confirmed all other aspects of his

5   description (Tr. 102).

6        In determining whether officers had probable cause or reasonable suspicion for an arrest

7   or stop, the collective knowledge doctrine "allows courts to impute police officers' collective

8   knowledge to the officer conducting a stop, search, or arrest."  *United States v. Villasenor*, 608

9   F.3d 467, 475 (9th Cir. 2010).  The information underpinning the cause determination need not

10  have been communicated to the arresting officer, "particularly where, as here, the agents were

11  working in close concert."  *United States v. Bernard*, 623 F.2d 551, 561 (9th Cir. 1979).  The

12  doctrine therefore relieves the arresting officer of the requirement "at the moment of arrest to

13  possess personal knowledge of all the facts and circumstances," and instead looks to "the

14  objective facts available for consideration by the agencies or officers participating in the

15  arrest."  *Ibid.*  (quoting *United States v. Stratton*, 453 F.2d 36, 37 (8th Cir. 1972)).

16       In the typical collective knowledge analysis the arresting officer does not possess

17  reasonable suspicion or probable cause, but other officers working in concert with her do.  In

18  that scenario, courts turn to the objective facts known to the non-arresting officers, "regardless

19  of whether that information was actually communicated to [the arresting officer]."  *United*

20  *States v. Bertrand*, 926 F.2d 838, 844 (1991).

21       This order holds that here, too, the inquiry must turn to the "objective facts available for

22  consideration by the . . . officers participating in the arrest."  *Bernard*, 623 F.2d at 561.  Officer

23  Hurtado's body camera video provides incontrovertible evidence that the first-hand

24  information available to Officer Hurtado revealed defendant to be a perfect match to the

25  fleeing suspect, tan shoes and all.  That objective record of what Officer Hurtado actually

26  observed controls, even though he erred, in the stress of the moment, as to the color of the

27  shoes.  The suspect who fled on Mission Street was a Hispanic male dressed identically (shoes,

28  pants, jacket) to defendant, a Hispanic male found hiding at the very corner where the suspect

United States District Court
Northern District of California

had last been seen four minutes earlier.  There was more than reasonable suspicion to detain him.

To be very clear, the outcome is the same if the body camera evidence is ignored and the description as related by Officer Hurtado – "Hispanic male, dark skin, long hair, blue jacket and jeans, and *black* shoes" – is assumed to constitute the state of the arresting officers' collective knowledge.  At the time of his detention defendant matched the description but for the shoe color.  Considering the totality of the circumstances and the specificity of the description at issue, the fact that a single detail of defendant's appearance did not match the description does not render defendant's seizure the product of "an inchoate and unparticularized opinion or hunch."  *Terry*, 392 U.S. at 28.

In *United States v. Vandergroen*, for example, dispatch alerted officers that a thin Hispanic male wearing a blue sweater with a Warriors logo had been seen carrying a pistol.  964 F.3d 876, 878-79 (9th Cir. 2020).  Our court of appeals found that, in the totality of the circumstances, the description relayed to the police supported reasonable suspicion justifying a stop even though the defendant was not Hispanic and thus only "mostly matched" the description.  *Id.* at 878, 882.  The same is true here.

### 2.  DEFENDANT'S ARGUMENTS TO THE CONTRARY.

The findings of fact above are the district judge's evaluation of the evidence.  In the ordinary course, a line-by-line analysis of the disputes resolved by those findings is not necessary.  Nevertheless, this order will now address a number of defendant's quarrels with the above.  The below discussion will, in this instance, serve to clarify the record by dispelling various misstatements of law and fact that underpin defendant's positions.

As an initial matter, this order addresses defendant's divide-and-conquer mode of analysis.  Defendant provides a piecemeal analysis of the above facts, arguing that each, considered alone, cannot be the basis of the officers' reasonable suspicion.  The Supreme Court, however, has held that courts must consider the *totality* of the circumstances in determining whether an officer had sufficient reasonable suspicion, thereby rejecting defendant's "divide and conquer" approach.  *United States v. Arvizu*, 534 U.S. 266, 273–75

(2002).  "We need not decide whether any single fact would be enough to support suspicion because we are not called upon to review single facts in isolation."  *United States v. Valdes-Vega*, 738 F.3d 1074, 1079 (9th Cir. 2013).  As a result, this Court is "preclude[d] . . . from holding that certain factors are presumptively given no weight without considering those factors in the full context of each particular case."  *Id*. at 1079.  While some factors may be more probative than others, "this evaluation cannot be done in the abstract by divorcing factors from their context in the stop at issue."  *Ibid*.

Nevertheless, in the interests of clarity, defendant's quarrels with individual facts comprising the totality are considered below.

### A.   THE DESCRIPTION PROVIDED BY B.M.

As noted above, Officer Frisk, and then Officer Hurtado, approached witness B.M. in the doorway of the restaurant on the southeast corner of 23rd and Bartlett and asked her if she saw where "the running man" went.  Defendant now argues that B.M. could not have been referring to him because she reported to the officers that the running man was "hiding in the white house," while "*[s]ignificantly*, Mr. Aguilera was not inside the white house when he was detained, and was instead lying in the tall grass behind a fence outside the white house" (Suppl. Br. at 8, emphasis added).

Defendant misstates the facts.

Video evidence shows that witness B.M. told officers that the person she saw running was hiding behind the white *fence*, not in the white house.  B.M. spoke in Spanish throughout her encounter with the police.  Officer Frisk was the first to speak to B.M., and after a brief discussion with her, reported to his colleagues that "I got a 909 saying he's hiding in this white *house* at the corner" (Exh. D. at 6:30).   Officer Frisk then exited his vehicle to clarify B.M.'s tip with her but was failed by his Spanish proficiency (Exh. D at 6:40).  As Officer Hurtado approached the pair, Frisk asked him, "can you get what she was saying?  There was a word I didn't understand, he's in the 'white *something*'" (Exh. D at 7:00).  Officer Hurtado then spoke with B.M., who clarified that she saw a man run to the intersection, attempt to hide by a parked car, and then relocate behind the white *fence* at the northeast corner, and confirmed that the

man was still hidden behind that fence (and he was) (Exh. B at 6:40 – 7:02).  The entirety of Officer Hurtado's discussion with B.M. took place shortly before defendant's seizure, and its contents were within the "collective knowledge" of the arresting officers.

Defendant's argument seizes upon Officer Frisk's incorrect translation, misattributes it to B.M. herself, and then ignores the clarification provided to Officer Hurtado prior to defendant's arrest.  Indeed, defendant's counsel attempted the same maneuver during Officer Hurtado's cross-examination, and was corrected by the witness:

> Q. Okay.  And she said that the person who was running was hiding in a white house at the corner of 23rd and Bartlett; right?
>
> A. She didn't say 'white house'; she says 'white fence.'
>
> Q. Okay. At the Corner of 23rd and Bartlett?
>
> A. Yes.

(Tr. 139:21-140:5).  B.M. described precisely the location where defendant was found.

### B.    WHETHER OFFICER HURTADO OBSERVED A SUSPECT ON 22ND STREET.

Defendant argues that Officer Hurtado was not credible when he testified that witness Jane Doe pointed out an actual person visible to him, despite video evidence that Officer Hurtado pointed in the same direction as Doe and exclaimed "*that guy, it's going to be that guy,*" after which Officer Frisk, just a step behind, radioed in the bearing of the suspect (Suppl. Br. 3 – 5; Exh. B at 1:35 – 1:40; Exh. D at 1:50 – 2:10).

*First*, defendant argues that Officer Hurtado did not behave in any way consistent with there being an allegedly armed suspect in sight, and that "Hurtado did not even look westbound from Capp Street towards Mission Street where the woman pointed," and instead "just stood there and looked southbound on Capp Street" (Suppl. Br. 6).

Defendant again misstates the facts.

Officer Frisk's body camera footage, Officer Foote's Body Camera footage, and the El Trebol surveillance video (parsed and admitted into evidence by defendant) each show that after Jane Doe's tip,  Officer Hurtado indeed looked westbound down 22nd Street, pointed in

that direction when stating "that guy, it's going to be that guy," and then stared down in that direction, before briefly glancing eastbound toward El Trebol and Briseno and then returning to Grech's vehicle to pursue the suspect (Exh. F at 1:50 – 2:12; Exh. D at 1:50 – 2:10; Exh. L at 2:20 – 2:40). Defendant's argument relies on the fact that Officer Hurtado's body camera – mounted to his chest – was looking southbound on Capp Street. Officer Hurtado's eyes and head, however, were facing sideways and westbound, as plainly shown by the cameras of Officers Frisk and Foote, and defendant's admitted security camera footage.

*Second*, defendant argues that the only reasonable reaction to an armed suspect a block away is to shout, run, or attempt to catch him. True, Officer Hurtado did not run and chase after the suspect at that moment. Officer Hurtado explained that he preferred to engage the armed suspect while inside a bulletproof vehicle, and that simply running after him would be unsafe (Tr. 84 – 85). That is reasonable enough. Officer Hurtado proceeded to do just that when he re-entered Grech's vehicle and pursued the suspect down 22nd Street and onto Mission. This order declines counsel's invitation to "entangle the courts in endless second-guessing of police decisions made under stress and subject to the exigencies of the moment." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). The officers' decisions regarding when and how to engage an armed suspect do not negate the countervailing video evidence showing that both Officers Hurtado and Frisk made clear statements consistent with having seen a suspect on 22nd Street who made a left on Mission Street.

*Third*, defendant argues that even if the officers did make visual contact with a suspect heading westbound on 22nd Street, it was "certainly not Aguilera" because the surveillance camera video from the corner of Capp and 22nd Street "showed that Aguilera left the area . . . *before the police car arrived and that he never returned*" (Suppl. Br. 5, 7).

Defendant overstates the evidence.

The surveillance video shows that defendant crossed the street westbound down 22nd Street, and that as a police cruiser arrived at the intersection of 22nd and Capp, defendant veered behind a food truck parked at the southwest corner of the intersection, just barely in view of the camera (Exh. L at 0:52 – 1:05). It is unclear what happened to defendant from that

point forward, but a shadowy figure is seen loitering beside the truck for several more seconds. Finally, at about 2:01:17, a black silhouette emerged from behind the food truck and proceeded westbound down 22nd Street (*id*. at 1:53 – 2:13).  As that silhouette neared the edge of the video's frame, Jane Doe stepped onto the sidewalk, pointed westbound down 22nd Street towards that silhouette, and Officer Hurtado entered the frame (*id*. at 2:11 – 2:29).  It is impossible, given the angle and quality of the picture, to make out whether the silhouette heading westbound down 22nd Street was at that second in Officer Hurtado's view, though his and Officer Frisk's reactions to Doe's tip indicate that it was.  Moreover, it is impossible to know if that silhouette was or was not defendant.  But there were circumstances suggesting the shooter was headed down 22nd Street toward Mission.

### C.   BRISENO'S DESCRIPTION OF THE SUSPECT'S JACKET.

Defendant argues that witness Briseno stated that the suspect was wearing a bright blue *and yellow* jacket.

Officer Hurtado's incident report, prepared after defendant's arrest, stated that Briseno described the suspect as a "Hispanic male wearing a bright blue and yellow jacket and blue jeans" (Exh. A at US-FA-00000013).  On the stand, however, Officer Hurtado stated that the description was of a "blue jacket," no yellow (Tr. at 12:11-15).  Officer Hurtado explained that he made a mistake when writing his report:  because the jacket was bright blue, he "was thinking bright, and then [he] associated that with yellow" (Tr. 55-2-7).  He explained that the same mistake appeared in Officer Grech's incident report because she did not speak Spanish and relied on his report when drafting her own (Tr. 16:10-17).  The jacket worn by Aguilera when he was seized and subsequently arrested was blue alone – no yellow (Exh. 15).

Defendant suggests that during the inaudible portion of their discussion, Briseno told Officer Hurtado that the suspect was wearing a "blue and yellow jacket," and that, on the stand, Officer Hurtado engaged in a calculated, after-the-fact effort to scrub Briseno's description of the sole detail that did not conform to defendant's appearance at the time of his arrest.  (Suppl. Br. 1-3, "Hurtado remembered all the other details from Briseno about the

1    description of the suspect provided before the audio of his BWC was working, but he

2    conveniently denied the detail that is inconsistent with Aguilera's appearance.").

3         Defendant's argument ignores the facts.

4         *First*, in the audible portion of his tip to Officer Hurtado, Briseno says "una chamarra

5    azul – a blue jacket" – no yellow (Exh. B 0:30 – 0:38).  Defendant provides no reason why

6    Briseno would have described the jacket as "blue and yellow" during the inaudible portion of

7    his discussion with Officer Hurtado only to scrub that detail from his audible repetition of the

8    jacket's description moments later.

9         *Second*, Officer Hurtado relayed the tip to Officer Frisk as "blue jacket" just seconds

10   after speaking with Briseno (*id*. at 1:15 – 1:20).  Defendant had not yet been seized, and his

11   jacket was not at issue.  Every time the description was repeated prior to defendant's seizure,

12   the jacket was blue – no yellow.

13        *Third*, when Officer Frisk interviewed Briseno after the defendant's arrest, Briseno again

14   described the jacket as blue – no yellow.

15        The description received from Briseno was recounted by Officer Hurtado moments after

16   the fact:  Hispanic male wearing a blue jacket.  The reference to a "blue and yellow" jacket in

17   Officer Hurtado's report was the result of an after-the-fact mistake and has no bearing on the

18   reasonable suspicion analysis at issue here.  The reference to the same in Officer Grech's

19   report was the result of her reliance on Officer Hurtado's translation (Dkt. No. 47 ¶ 8).

20        The foregoing is sufficient, but note as well that yellow did in fact fit into the clothes

21   worn by defendant.  Specifically, he was wearing tan shoes that looked yellow on Officer

22   Hurtado's body worn camera and in post-arrest photographs.  Witness Briseno may have

23   referenced blue jacket and yellow shoes (before the camera rolled), and that comment was

24   misremembered as a blue and yellow jacket.

25              **D.    THE PARTICULARITY OF BRISENO'S TIP.**

26        Defendant next argues that Briseno's tip was not sufficiently particularized.  This

27   argument again improperly divorces the fact being considered from the necessary context.

28   Defendant's attempt to distinguish this Court's holding in *United States v. Diaz* is instructive

United States District Court
Northern District of California

14

(Reply 4).  No. CR 05-0167 WHA, 2006 WL 3086732 (N.D. Cal. Oct. 30, 2006).  There, defendant correctly noted that the tip at issue in *Diaz* – "an African-American male, juvenile or adult, wearing a black shirt and black or blue jeans" – supported officers' reasonable suspicion only in light of the totality of the circumstances (i.e., defendant's presence at the intersection of the shooting alongside two known members of the Down Below Gang) (Reply 4, "It was the combination of all three of these factors . . . that the Court found sufficient.").  Defendant fails to similarly contextualize Briseno's tip, which, considered in the totality of the circumstances, supported the officers' reasonable suspicion.

*United States v. Bautista*, cited by defendant, further illustrates his error.  684 F.2d 1286 (9th Cir. 1982).  There, three men robbed a bank in Woodland Hills, California, making off with about $1,000.  *Bautista*, 684 F.2d at 1287.  The two defendants were stopped by police 15 minutes after the robbery report, about a half mile from the bank.  The stopping officers relied on a description of the suspects that was no more than a hedged guess at their ethnicity:  they were "armed and of Iranian or Mexican descent."  *Ibid*.  Nothing more.  Piecemeal analysis of that description would suggest that it could not possibly support reasonable suspicion.  Nevertheless, the totality of the circumstances, including the description of the suspects, justified an investigatory stop:

> [T]he police did not stop the defendants *solely* because their racial appearance matched the racial description of the robbery suspects. The police *also* noted the defendants' presence on a likely escape route one-half mile from the bank and a few blocks from the suspected getaway car, only 15 minutes after the robbery. The defendants were the only people in sight who matched the description of the robbers. The policemen observed that the defendants' dress was inappropriate for the weather, and that their relatively dry appearance, despite the rain, was consistent with having just left a car. These facts and circumstances justified the police officers' decision to make an investigatory stop.

*Id*. at 1289 (emphasis added).  The same is true here.  The tip alone need not give rise to reasonable suspicion – the totality of the circumstances does.

Defendant further argues that "the existence of multiple people matching a description weighs against a finding of particularized reasonable suspicion to detain anyone based upon

15

1      that description" (Suppl. Br. 10-11).  While that may be true as a general matter, defendant

2      does not establish that there were any other individuals present that matched the description

3      given.

4          A few of the "potential[] match[es]" flagged in defendant's motion are addressed here

5      (*id.* at 10).

6          *First*, two of defendant's potential matches were eliminated as suspects because they did

7      *not* match witness Briseno's description.  For example, the woman in the restaurant on the

8      southeast corner of 23rd and Bartlett was eliminated as a suspect by Officer Hurtado.  True,

9      Officer Hurtado, while walking southbound down Bartlett Street, exclaimed that he saw the

10     suspect inside of the restaurant (Exh. B at 6:10 – 20).  However, Officer Hurtado was then a

11     significant distance from the restaurant windows, and his view was further obstructed by a

12     police cruiser, its emergency lights flashing, sitting between himself and the woman in

13     question.  As Officer Hurtado drew closer and rounded the cruiser, he corrected his mistake:

14     "oh, no, no, no, no, never mind.  Okay, she has a very similar jacket" (Exh. B at 6:25 – 35).  The

15     woman in the restaurant was not seized or detained and did not otherwise interact with the

16     police – she was eliminated as a potential suspect the moment Officer Hurtado gained an

17     unobstructed view.  No other officer closer to the restaurant windows at any point mistook the

18     woman for the suspect.  The description did its job.

19         Likewise, the first individual encountered by Officers Grech and Hurtado on Mission

20     Street, another potential match flagged by defendant, was also explicitly eliminated as a

21     suspect by Officer Hurtado.

22         *Second*, "the suspect seen by Officer Frisk going north on Mission from 22nd Street" was

23     not a potential match because he did not exist.  As explained above, Officer Frisk's initial

24     comment – that the suspect was seen headed "northbound" on Mission, and "just hung a left" –

25     was partly in error.  A left from 22nd would take the suspect southbound, not northbound.

26     Officer Frisk corrected himself seconds later when he informed Grech that "he went over there,

27     *he's on the left side over there*."  Officer Frisk's momentary error did not conjure up a second

28     suspect heading north.

United States District Court
Northern District of California

*Third*, there is nothing to suggest that the unknown individual with a limp referenced in the 2:01 a.m. 911 call was a potential match, because the presence of a limp was the full extent of the description provided.  Witness Briseno did not mention a limp.  Moreover, Briseno's physical description was further limited by a narrow geographic qualifier:  the suspect was headed *westbound* from the intersection of 22nd and Capp.  The individual with a limp was reported heading *eastbound* on 22nd – the opposite direction.  No match.

*Finally*, defendant's comparison to *Goodson v. City of Corpus Christi* is inapposite.  (Br. 13). 202 F.3d 730, 738 (5th Cir. 2000).  There, a BOLO ("be on the look out") was issued over police radio for a suspect involved in a family assault on Violet Road.  *Id*. at 731.  The Goodson defendant was seized roughly *three miles* from Violet Road.  *Ibid*.  The man that the police were looking for was found some *eight miles* from where Goodson was detained.  *Id*. at 734.  Moreover, there were no other facts tending to corroborate a suspicion of criminal behavior.  The Fifth Circuit held that police could not have reasonable suspicion to stop any "tall, heavy-set white man" because "[s]uch a description would simply be too vague, and fit too many people to constitute particular, articulable facts."  *Id.* at 737.  The facts here are not the same.  Defendant was not apprehended at Oracle Park (less than three miles from El Trebol), or de Young Museum (roughly three miles from El Trebol) following a city-wide BOLO.  Briseno stated that the shooter was heading west on 22nd Street.  Officers saw a suspect matching the description westbound on 22nd just before he turned left on Mission Street, where he was later found by Officers Grech and Hurtado.  Officers then chased that suspect to the corner of 23rd and Bartlett, where he was lost, and defendant (matching the same description) was found, concealed in a patch of weeds, roughly four minutes later. The entire episode took place on a rainy Friday morning, just after 2 a.m.  These facts, alongside the totality of the circumstances laid out in full above, do not suggest that the description provided applied to "too many people."  *Ibid*.

### E.   THE RELIABILITY OF EYEWITNESS TIPS.

Defendant argues that the three witness' statements to officers "lacked adequate reliability to be the basis for the reasonable suspicion needed to seize Mr. Aguilera" (Br. 9).

Tips from informants exist along a spectrum of reliability. *United States v. Palos-Marquez*, 591 F.3d 1272, 1275 (9th Cir. 2009). At one end of the spectrum, a tip by an informant "who [has] provided information in the past and [is] known to the officer" may justify an investigatory stop absent other factors, as it did in *Adams v. Williams*. *Id*. at 1275 (citing *Adams v. Williams*, 407 U.S. 143 (1972)). "At the other end of the reliability spectrum, the Court in *Florida v. J.L.* held that a tip from an anonymous caller telephoning from an unknown location, who reported only that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun, lacked any indicia of reliability and could not provide reasonable suspicion for an investigatory stop." *Id*. at 1275 (citing *Fla. v. J.L.*, 529 U.S. 266 (2000)).

Defendant argues that the various face-to-face tips received by police are akin to the unreliable tip at issue in *J.L.* (Br. 10-11). Our court of appeals disagrees: "When the tip is provided in a face-to-face encounter, even when the informant is unidentified, we have deemed it to be closer to the *Adams* end of this reliability spectrum." *Palos-Marquez*, 591 F.3d at 1275; *see also United States v. Sierra-Hernandez*, 581 F.2d 760, 763 (9th Cir. 1978). This is because the informant risks losing anonymity and being held accountable for a false tip, and the officer can judge the informant's demeanor and evaluate their credibility. *Ibid*. In *Palos-Marquez*, a UPS driver used gestures to draw a Border Patrol agent's attention to a pickup driving along the same highway. *Id*. at 1273. The UPS driver then pulled over and told a Border Patrol agent in person that he had seen the pickup load up with several suspected undocumented migrants. *Id*. at 1274. Here, too, each tip was delivered face to face, contributing to their reliability.

Contrary to defendant's argument, the fact that a face-to-face tipster's identity is not established prior to seizure, or indeed at any time thereafter, does not destroy that tip's reliability. *Id.* at 1276. Such tips are "reliable because the in-person informant *risked* his anonymity, not because officers were able to later track down the informant." *Ibid*. (emphasis added); *Sierra-Hernandez*, 581 F.2d at 763 (finding a face-to-face tip sufficiently reliable even though "the informant was not known to the officer and cannot be traced."). Here, too, each

tipster risked their anonymity (meaning they got involved) and subjected themselves to in-person credibility evaluations by officers.

Several other facts weigh in favor of the tips' reliability.  A tip "made contemporaneously with a complainant's observations" is more reliable than one made later in time.  *United States v. Fernandez-Castillo*, 324 F.3d 1114, 1119 (9th Cir. 2003).  A tip is likewise considered more reliable "if the informant reveals the basis of knowledge of the tip."  *United States v. Rowland*, 464 F.3d 899, 908 (9th Cir. 2006).  Finally, the fact that officers seize a suspect "fitting the [tipster's] description within minutes of his statement" weighs in favor of the tip's reliability.  *Palos-Marquez*, 591 F.3d at 1277.  Briseno relayed his tip near to when and where he observed the events, indicated that he had first-hand knowledge of the crime, and officers seized defendant within minutes of Briseno's statement.  B.M. likewise relayed her tip almost exactly in the time and place she observed the events and indicated that she had first-hand knowledge. Defendant was seized seconds after her tip.

Defendant next argues that Briseno's statement lacked sufficient indicia of reliability because he was "so intoxicated that an officer [could not] understand his statement" (Br. 10). This argument misstates Officer Grech's statement by way of omission.  After defendant's seizure, Officer Grech stated that Briseno "*said it all in Spanish* and said it so drunkenly that I was like I don't understand what you're saying" (Exh. C at 29:20).   Officer Grech was not certified in Spanish through SFPD, did not speak Spanish often, and was not confident in her Spanish speaking skills (Dkt. No. 46 at ¶¶ 6-8).  Officer Hurtado, who took Briseno's tip, did not make any mention of intoxication and did not appear to have any issues with extracting a coherent statement from Briseno.

### F.    UNPROVOKED FLIGHT IN A HIGH CRIME AREA.

*First*, defendant argues that the suspect's flight was provoked and therefore did not support reasonable suspicion, citing the "sudden halt" of Officer Grech's patrol car, and the "aggressive[] yelling" of the officers (Suppl. Br. 6 – 7).

The Supreme Court has held that "[h]eadlong flight – wherever it occurs – is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly

suggestive of such." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).  An individual is free to ignore the police and go about their business, "[b]ut unprovoked flight is simply not a mere refusal to cooperate."  *Id*. at 125.  "[T]he Supreme Court has never endorsed a per se rule that flight establishes reasonable suspicion.  Instead, the Court has treated flight as just one factor in the reasonable suspicion analysis, if an admittedly significant one."  *United States v. Brown*, 925 F.3d 1150, 1155 (9th Cir. 2019).  Defendant provides extensive citations to precedent acknowledging the general proposition that people may flee from the police for innocent reasons.  However, defendant provides no decisions that declined to consider a suspect's flight within the totality of the circumstances because of the "aggressive" demeanor of the police.  *Valdes-Vega*, 738 at 1080 ("Even innocent, noncriminal acts can foster reasonable suspicion in the total context.  There is no need for an officer to rule out an innocent explanation.") (citation omitted); *see Arvizu*, 534 U.S. at 274 (same).

Indeed, *United States v. Brown*, cited by defendant, belies his assertion that the suspect's flight must be set aside because of the officers' alleged provocation.  925 F.3d 1150 (9th Cir. 2019).  There, a 911 caller related a third-party tip that a young, black man wearing a camouflage jacket and red shoes was seen with a gun.  *Id*. at 1152.  It is presumptively lawful to carry a firearm in Washington state, and the 911 tip contained no facts indicating criminal activity.  *Id*. at 1153.  Two officers responded to the 911 call, spotted Brown from their patrol car, and began to drive behind Brown slowly for several blocks before turning on their patrol lights, at which time Brown ran.  *Id*. at 1152.  In evaluating Brown's flight, our court of appeals emphasized that "the officers did not communicate with Brown, use their speaker to talk with him, or tell him to stop before they flashed their lights and then detained him."  *Id*. at 1155.  *Brown* distinguished that lack of communication from the flight at issue in *Smith*, "where the officer activated his siren twice, pulled over, and exited his vehicle before commanding Smith to stop," after which the defendant "suddenly broke out into a headlong run, which the [Supreme] [C]ourt found to be for 'no other reason than to evade.'"  *Id*. at 1155 (quoting *Smith*, 633 F.3d at 891, 894).  The flight at issue here was closer to *Smith* than

20

*Brown*.  The suspect took off in headlong flight after Officers Grech and Hurtado made clear, direct requests for him to stop, suggesting an attempt to evade.

Moreover, *Brown* itself did not simply cast aside flight as a factor, as defendant urges this order to do.  Our court of appeals recognized that "Brown's flight might be suggestive of wrongdoing," but found that, within the totality of the circumstances, "it did not corroborate any reliable suspicion of criminal behavior[:]"

> the totality of the circumstances here does not add up to enough:
> no reliable tip, no reasonable inference of criminal behavior, no
> police initiative to investigate a particular crime in an identified
> high crime area, and *flight without any previous attempt to talk to
> the suspect*. We conclude that the Metro officers did not have
> reasonable suspicion of criminal activity when they stopped and
> frisked Brown.

*Brown*, 925 F.3d at 1156-57 (emphasis added).  As in *Brown*, this order considers the suspect's flight within the *totality* of the circumstances.  Given the very different circumstances at issue here, flight in this instance did indeed "corroborate [a] reliable suspicion of criminal behavior." *Ibid*.

At oral argument, defendant's counsel again attempted to place the suspect's flight outside this order's reasonable suspicion analysis by arguing that *Wardlow* allows consideration of flight *only* if that flight is shown to have occurred in a "high crime area," which the government has not.  Not so:  "[h]eadlong flight – *wherever it occurs* – is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Wardlow*, 528 U.S. at 124 (emphasis added).

### G.    WHETHER OFFICERS SAW DEFENDANT'S CLOTHING BEFORE DETAINING HIM.

Defendant argues that the government has failed to show that the arresting officers perceived the details of defendant's appearance immediately prior to seizing him (Suppl. Br. 8-9).

*First*, at oral argument, defendant's counsel suggested that, while the house behind defendant was illuminated by lights, the patch of weeds, and defendant himself, remained shrouded in the shadows until after his capture.  This argument again misstates the facts

1   reflected by body camera footage.  Both Officers Grech and Aiello's body cameras show that

2   Officer Frisk established a line of sight to defendant through a large gap in the fence and

3   pointed his flashlight directly at defendant before detaining him (Exh. E at 3:14 – 3:25; Exh. C

4   at 7:09 – 7:13).

5        *Second*, defendant takes issue with the fact that "the officers made no reference to the

6   appearance of the person lying in the tall grass before detaining him" (Suppl. Br. 8).  That cuts

7   no figure.  The seizing officers were on the hunt for a suspect who they believed, with good

8   reason, was armed.  They further believed that he may have moments before pointed a gun at

9   Officer Hurtado.  It is unreasonable to suggest that the officers, upon discovering defendant,

10  who matched the description of the suspect, hiding at the very intersection Officer Hurtado last

11  saw him, ought to have paused to remark to one another, "he is a Hispanic male with dark skin,

12  long hair, wearing a blue jacket."

13       *Third*, defendant notes that the body camera footage does not reveal the details of

14  Aguilera's appearance  (Suppl. Br. 8).  True, the arresting officers' body camera footage is

15  largely obscured by the white picket fence between themselves and Aguilera because the

16  cameras are mounted to the officers' chests.  For the same reason, the body camera footage is

17  not a complete record of what was seen by the arresting officers' eyes, located a significant

18  distance above.  Moreover, as stated above, the body camera footage of both Officers Aiello

19  and Grech show that Officer Frisk, who detained defendant, established a view of defendant

20  through a large gap in the fence, and pointed his flashlight directly at defendant before

21  detaining him.

22       Most of all, common sense dictates that if officers were able to see defendant proned in

23  the grass and were able to see the location of his hands, then they would also be able to see

24  what defendant was wearing.  The contrary argument – that police saw defendant but saw

25  nothing of his physical appearance – is convenient but illogical.

26            ***H.    SHOTSPOTTER ALERTS.***

27       Defendant argues that "ShotSpotter *cannot* be the basis for reasonable suspicion either"

28  (Dkt. No. 18 at 10).  The Supreme Court and the Ninth Circuit have not yet ruled on the issue

United States District Court
Northern District of California

1    of ShotSpotter alerts and their role in the reasonable suspicion analysis.  Two circuits have.

2    *United States v. Rickmon*, 952 F.3d 876 (7th Cir. 2020); *United States v. Jones*, 1 F.4th 50

3    (D.C. Cir. 2021).  In *Rickmon*, cited by defendant, the Seventh Circuit concluded that

4    ShotSpotter alerts are analogous to an anonymous tip and **can** contribute to an officers'

5    reasonable suspicion where they are corroborated by other sources of information describing

6    the general area and nature of the same crime.  952 F.3d at 882.  There, two ShotSpotter alerts,

7    corroborated by multiple 911 calls, gave the officer "a good idea of what to be on the lookout

8    for when he arrived."  *Ibid*.  In *Jones*, the D.C. Circuit likewise considered ShotSpotter alerts

9    within its totality of the circumstances analysis.  *Jones*, 1 F.4th at 54.

10        The analysis in *Rickmon* and *Jones* comports with the general principle laid out by our

11   court of appeals requiring that each fact be considered and weighed "in the full context of each

12   particular case." *Valdes-Vega*, 738 F.3d at 1079.  Accordingly, it is adopted here.  The alerts

13   received by SFPD were corroborated by two 911 calls and Briseno's face-to-face tip.  The

14   corroborated ShotSpotter alerts did not alone form the basis of the officers' reasonable

15   suspicion, but when considered in the totality of the circumstances fairly contributed to that

16   suspicion.

17                    *I.    THE 2:01 A.M. 911 CALL.*

18        Defendant argues that the 911 call received at 2:01 a.m. "serves to dissipate any

19   particularized reasonable suspicion that officer's [*sic*] may have had" because it "fails to

20   correspond to Mr. Aguilera at the time of the arrest" (Reply 3).  Not so.  The reasonable

21   suspicion analysis "allows officers to draw on their own experience and specialized training to

22   make inferences from and deductions about the cumulative information available to them that

23   might well elude an untrained person." *Arvizu*, 534 U.S. at 273 (citations and internal

24   quotation marks omitted).  While a court need not defer to an "inchoate and unparticularized

25   suspicion or hunch," "due weight must be given . . . to the specific reasonable inferences which

26   [an officer] is entitled to draw from the facts in light of his experience." *United States v.*

27   *Crapser*, 472 F.3d 1141, 1147 (9th Cir. 2007); *United States v. Cortez*, 449 U.S. 411, 418

28   (1981) ("Finally, the evidence thus collected must be seen and weighed not in terms of library

                                              23

analysis by scholars, but as understood by those versed in the field of law enforcement."). Officers responded to four separate reports of the sound of gunshots. None claimed to have seen a shooter. The caller in question reported that he saw a sedan and pedestrian through a home camera near the time he heard gunshots, not that he saw either shoot a gun. It would have been entirely appropriate for officers to infer that the sedan and pedestrian heading east on 22nd were associated with the gunshots, but they were not required to make that inference to the exclusion of others.

When police arrived at 22nd and Capp (where the 2:01 a.m. call originated), an eyewitness, Briseno, reported that the shooter was heading westbound toward Mission Street, and a suspect was spotted heading that way. The decision to pursue Briseno's face-to-face tip in favor of the 2:01 a.m. 911 call was a reasonable one.

### 3. DEFENDANT'S SEIZURE ALLOWED OFFICERS TO SEARCH DEFENDANT.

Officers possessed the required reasonable suspicion to search defendant after his seizure. "[W]hereas a Terry stop is justified by reasonable suspicion that criminal activity may be afoot, a frisk of a person for weapons requires reasonable suspicion that a suspect is armed and presently dangerous to the officer or to others." *Thomas v. Dillard*, 818 F.3d 864, 876 (9th Cir. 2016), as amended (May 5, 2016) (internal quotation marks and citations omitted). The standard asks whether "a reasonably prudent [person] would have been warranted in believing [the suspect] was armed and thus presented a threat to the officer's safety while he was investigating his suspicious behavior." *Dillard*, 818 F.3d at 876 (quoting *Terry*, 392 U.S. at 28). The nature of the suspected crime can itself support a reasonable suspicion that the suspect seized is armed and dangerous. *United States v. Johnson*, 581 F.3d 994, 1000 (9th Cir. 2009).

Here, the officers who seized defendant had reasonable suspicion that he had fired several shots in a city street just a few minutes ago. This gave officers reasonable suspicion to frisk Aguilera, and *a fortiori*, to demand that Aguilera show them his hands. It was this request that led Aguilera to bring the pistol on his person into plain view.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

With apologies for a too-long order, its essence comes down to this:  The officers had sufficient cause to try to stop their suspect as he walked away from the scene of the crime in close proximity, geographically and timewise, to the crime because he matched an eyewitness description (Hispanic male, wearing a blue jacket) and broke into headlong flight when asked to stop by police.  Minutes later, defendant was found nearby, hiding where the suspect had last been seen, wearing the same jacket (blue), pants (black) and shoes (tan) as the suspect in flight (as captured by Officer Hurtado's body worn camera).  The match was about as exact as policework in a big city ever gets.

Defendant is not entitled to suppression of any evidence obtained as a result of his seizure.

**IT IS SO ORDERED.**

Dated:  March 22, 2024

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE