UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

        Plaintiff,

   v.

FERNANDO AGUILERA,

        Defendant.

No.  CR 23-00217 WHA

**ORDER DENYING DEFENDANT'S MOTION TO DISMISS THE INDICTMENT UNDER THE SECOND AMENDMENT**

## INTRODUCTION

This order holds that a convicted felon has no constitutional right to possess, much less use, a firearm or ammunition.  Defendant's arguments to the contrary are rejected, and his motion to dismiss is **DENIED**.

## STATEMENT

In the wee hours of April 7, 2023, SFPD officers responded to multiple reports of shots fired outside a bar in our Mission District.  With the help of eyewitness tips, they converged on a suspect walking away from the scene.  That suspect fled when ordered to stop, and a foot chase ensued.  As he rounded the corner of Mission and 23rd, he turned back and thrust his arm out toward the pursuing officer, who leapt behind a trashcan.  The officer later lost his man at the intersection of Bartlett and 23rd, not far from the bar.  After a brief search, officers found defendant Fernando Aguilera hiding in a wet, fenced-off patch of grass at that very

intersection.  He was in possession of a 9mm pistol, without serial number, 10 rounds of Geco 9mm ammunition, 1 round of .357 Sig Sauer ammunition, 3 Winchester-Olin spent cartridges, 2 Geco spent cartridges, and one unloaded magazine.  Surveillance video obtained after defendant's arrest showed an individual matching his appearance indiscriminately firing a pistol in the neighborhood of densely packed row houses and apartments.  Defendant was charged by indictment with violation of 18 U.S.C. Section 922(g)(1), which prohibits the possession of firearms and ammunition by convicted felons.

Defendant entered the United States twelve years ago.  He is here without permission:  he has no legal status now, and there is no indication that he had legal status at any prior time.  Defendant has had one "verified" job over the course of those twelve years, with "Jose's Towing," where he worked for about two years.  Jose's Towing does not have a valid license to operate and has been suspended by the San Francisco City Attorney.  The owner of Jose's Towing is now facing his own federal indictment for insurance fraud and money laundering.  Defendant, meanwhile, lacks both a California driver's license and a towing permit.

Defendant has four prior felony convictions, including a 2022 conviction on two counts of second-degree burglary for conduct that occurred on two separate occasions.  He has been arrested more than a dozen times and is currently subject to an active restraining order, set to expire on March 7, 2025.  Charges dismissed or otherwise not prosecuted run the gamut:  car theft, hit and run, DUI, driving without a license, battery, assault (with and without a deadly weapon), robbery, burglary (first- and second-degree), domestic violence, violation of a court order to prevent domestic violence, child endangerment, drug possession, and so on.

In October 2023, defendant brought a motion to suppress, arguing that the SFPD lacked reasonable suspicion when they seized and searched him (Dkt. No. 18).  After an evidentiary hearing, that motion was denied (Dkt. No. 51).

Defendant now brings a motion to dismiss the indictment against him, arguing that Section 922(g)(1) violates the Second Amendment, both facially and as applied.

In May 2024, a three-judge panel of our court of appeals deemed Section 922(g)(1) unconstitutional.  *United States v. Duarte*, 101 F.4th 657 (9th Cir. 2024).  Our court of appeals

United States District Court
Northern District of California

1    granted an *en banc* rehearing and vacated the panel's decision shortly thereafter.  *United States*

2    *v. Duarte*, 108 F.4th 786 (9th Cir. 2024).  Oral argument is set to take place in December 2024.

3    Defendant has been in continuous custody since his indictment in July 2023.  He is entitled to a

4    speedy resolution of the prosecution against him.

5

6                                          **ANALYSIS**

7         The Second Amendment reads:  "A well-regulated Militia, being necessary to the

8    security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

9    Section 922(g)(1), meanwhile, provides that "it shall be unlawful for any person who has been

10   convicted in any court of, a crime punishable by imprisonment for a term exceeding one year .

11   . . [to] possess in or affecting commerce, any firearm or ammunition."

12        Our circuit (like all others) has long affirmed the constitutionality of Section 922(g)(1),

13   most recently in *United States v. Vongxay*.  594 F.3d 1111 (9th Cir. 2010).  Defendant argues

14   that an intervening Supreme Court decision, *New York State Rifle & Pistol Association v.*

15   *Bruen*, has *first* abrogated *Vongxay* and *second* rendered Section 922(g)(1) unconstitutional,

16   facially, and as applied.  597 U.S. 1 (2022).  This order disagrees on both counts.

17        The essence of this long order is, *first*, that *Vongxay* has not been abrogated by *Bruen*.

18   The latter did not rewrite the law in this area:  It clarified that the "history and tradition"

19   analysis laid out by Justice Scalia in *D.C. v. Heller* is the only means of justifying a burden on

20   the Second Amendment right. 554 U.S. 570 (2008).  *Vongxay*, decided two years after *Heller*,

21   was itself a faithful application of that precedent, and is therefore undisturbed by *Bruen*.

22   *Second*, Section 922(g)(1) passes constitutional muster even when subjected to the "history and

23   tradition" analysis anew.  The crucial decision here is *United States v. Rahimi*, decided by the

24   Supreme Court after *Bruen*.  144 S. Ct. 1889 (2024).  *Rahimi* observed that "some courts have

25   misunderstood the methodology" of *Bruen* and provided further guidance on that point.  *Id*. at

26   1897.  Applying the history and tradition methodology of *Bruen*, as clarified by *Rahimi*, this

27   order finds that Section 922(g)(1) fits comfortably within the Nation's longstanding regulatory

28   tradition.

United States District Court
Northern District of California

**1.**    *VONGXAY IS NOT CLEARLY IRRECONCILABLE WITH BRUEN AND REMAINS BINDING.*

*Bruen* did not expressly overrule *Vongxay*.  Under the "clearly irreconcilable" test, however, otherwise binding authority "is effectively overruled if intervening authority has so undercut the theory or reasoning underlying the prior circuit precedent as to make the precedent clearly irreconcilable with the intervening authority."  *Close v. Sotheby's, Inc.*, 894 F.3d 1061, 1073 (9th Cir. 2018) (internal quotation marks, citations omitted).  Our court of appeals has clarified that:

> Although we should consider the intervening authority's reasoning and analysis, as long as we can apply our prior circuit precedent without running afoul of the intervening authority, we must do so.  It is not enough for there to be *some tension* between the intervening higher authority and prior circuit precedent, or for the intervening higher authority to *cast doubt* on the prior circuit precedent.  The intervening higher precedent must be *clearly inconsistent* with the prior circuit precedent.  *This is a high standard.*

*Lair v. Bullock*, 697 F.3d 1200, 1207 (9th Cir. 2012) (internal quotation marks, citations omitted; emphasis added).

Defendant argues that *Bruen* "rewrote Second Amendment law," rendering *Vongxay* a dead letter (Dkt. No. 60 at 5).  Since *Bruen*, 45 district judges across our circuit have considered defendant's argument, and 44 have denied it.  This order agrees with the 44. [*]

---

[*] *United States v. Yates*, 710 F. Supp. 3d 733 (N.D. Cal. 2024) (Judge Araceli Martinez-Olguin); *United States v. Hill*, 629 F. Supp. 3d 1027 (S.D. Cal. 2022) (Judge William Hayes); *United States v. Butts*, 637 F. Supp. 3d 1134 (D. Mont. 2022) (Judge Donald Molloy); *United States v. Gamble*, 697 F. Supp. 3d 1045 (D. Nev. 2023) (Judge Jennifer Dorsey); *United States v. Hunt*, 697 F. Supp. 3d 1074 (D. Or. 2023) (Judge Karin Immergut); *United States v. Serrano*, 651 F. Supp. 3d 1192 (S.D. Cal. 2023) (Judge Janis Sammartino); *United States v. Jackson*, 656 F. Supp. 3d 1239 (W.D. Wash. 2023) (Judge Robert Lasnik); *United States v. Nevens*, No. CR 19-774-DMG, 2022 WL 17492196 (C.D. Cal. Aug. 15, 2022) (Judge Dolly Gee); *United States v. Broadbent*, No. 2:19-CR-00155-DJC, 2023 WL 6796468 (E.D. Cal. Oct. 13, 2023) (Judge Daniel Calabretta); *United States v. Still*, No. 2:22-CR-00074-RMP, 2023 WL 8482856 (E.D. Wash. Dec. 7, 2023) (Judge Rosanna Peterson); *United States v. Robinson*, No. 2:22-CR-00212-TL, 2023 WL 5634712 (W.D. Wash. Aug. 31, 2023) (Judge Tana Lin); *United States v. Page*, No. CR 23-06-H-BMM, 2023 WL 8702081 (D. Mont. Dec. 15, 2023) (Judge Brian Morris); *United States v. Hatch*, No. 23-CR-1201-CAB, 2023 WL 5020270 (S.D. Cal. Aug. 7, 2023) (Judge Cathy Ann Bencivengo); *United States v. Villalobos*, No. 3:19-CR-00040-DCN, 2023 WL 3044770 (D. Idaho Apr. 21, 2023) (Judge David Nye); *Walker v. Bonta*, No. 20-CV-00031-DMS-AGS, 2023 WL 6131086 (S.D. Cal. Sept. 19, 2023) (Judge Dana Sabraw); *United States v. Davis*, No. 121CR00206ADABAM1, 2023 WL 2505039 (E.D. Cal. Mar. 14, 2023) (Judge Ana de Alba); *United States v. Chatman*, No. 14-CR-00552-CRB-1, 2023 WL 3509699 (N.D. Cal. May 16, 2023) (Judge Charles Breyer); *United States v. Sais*, No. 22-CR-2456-GPC, 2023 WL 3510406 (S.D. Cal. May 17, 2023) (Judge Gonzalo Curiel); *United States v. Saba*, No. 1:22-CR-00248-AKB, 2023 WL 5333255 (D. Idaho Aug. 17, 2023) (Judge Amanda Brailsford); *United States v. Pineda*, No. 6:21-CR-00482-AA, 2023 WL 4053583 (D. Or. June 16, 2023) (Judge Ann Aiken); *United States v. Kosnicki*, No. 2:23-CR-0003-TOR, 2023 WL 8242455 (E.D. Wash. Nov. 28, 2023) (Judge Thomas

### A. HELLER, *THE CIRCUITS' MEANS-END ANALYSIS, AND* BRUEN'S *RETURN TO* HELLER.

In 1939, the Supreme Court rejected a constitutional challenge to the National Firearms Act's bar on the possession of sawed-off shotguns, holding:

> In the absence of any evidence tending to show that possession or use of a 'shotgun having a barrel of less than eighteen inches in length' at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument.  Certainly it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense.

*United States v. Miller*, 307 U.S. 174, 178 (1939).  Our circuit, like others, read *Miller* to endorse the so-called "collective rights" approach to the Second Amendment, under which the Second Amendment's guarantee was limited to the possession and use of arms in connection with militia service.  *See, e.g., Silveira v. Lockyer*, 312 F.3d 1052, 1087 (9th Cir. 2002), *as amended* (Jan. 27, 2003) ("The amendment protects the people's right to maintain an effective

Rice); *United States v. Hindman*, No. 3:23-CR-05062-DGE, 2023 WL 8020699 (W.D. Wash. Nov. 20, 2023) (Judge David Estudillo); *United States v. Roberts*, 710 F. Supp. 3d 658 (D. Alaska 2024) (Judge Timothy Burgess); *United States v. Adame-Lopez*, 713 F. Supp. 3d 1007 (D. Nev. 2024) (Judge Larry Hicks); *United States v. Dollison*, No. 3:18-CR-00066-SLG, 2024 WL 4145617 (D. Alaska Sept. 11, 2024) (Judge Sharon Gleason); *United States v. Rocha*, No. 1:24-CR-00081-KES-BAM-1, 2024 WL 4262467 (E.D. Cal. Sept. 19, 2024) (Judge Kirk Sherriff); *United States v. Pugh*, No. 2:21-CR-00451-ODW, 2024 WL 457139 (C.D. Cal. Feb. 6, 2024) (Judge Otis Wright, II); *United States v. Jessup*, No. CR-23-00223-001-PHX-DWL, 2024 WL 4108007 (D. Ariz. Sept. 6, 2024) (Judge Dominic Lanza); *United States v. Martinez*, No. 2:22-CR-00135-GMN-NJK-1, 2024 WL 2014215 (D. Nev. May 6, 2024) (Judge Gloria Navarro); *United States v. Miller*, No. CR 24-72-BLG-SPW, 2024 WL 4165135 (D. Mont. Sept. 12, 2024) (Judge Susan Watters);  *United States v. Sampson*, No. CR-24-00266-001-PHX-SMB, 2024 WL 4418209 (D. Ariz. Oct. 4, 2024) (Judge Susan Brnovich); *United States v. Coleman*, No. CR-23-02363-001-TUC-RCC (MSA), 2024 WL 3890710 (D. Ariz. July 29, 2024) (Judge Maria Aguilera), *report and recommendation adopted sub nom. United States v. Coleman*, No. CR-23-02363-001-TUC-RCC (MSA), 2024 WL 3888700 (D. Ariz. Aug. 21, 2024) (Judge Raner Collins); *United States v. Muhammad*, No. 1:23-CR-00236-NODJ-BAM-1, 2024 WL 4093679 (E.D. Cal. Sept. 5, 2024) (Judge Dale Drozd); *Horty v. United States*, No. 2:18-CR-00293-RCT, 2024 WL 1772033 (D. Idaho Apr. 24, 2024) (Judge Richard Tallman);  *United States v. Torres*, No. 1:23-CR-00219-BLW, 2024 WL 1555399 (D. Idaho Apr. 10, 2024) (Judge B. Lynn Winmill); *United States v. Linton*, No. CR 20-39-BLG-DLC, 2024 WL 1638588 (D. Mont. Apr. 16, 2024) (Judge Dana Christensen); *United States v. Alvarez-Mora*, No. 323CR00006MMDCSD, 2024 WL 1638382 (D. Nev. Apr. 15, 2024) (Judge Miranda Du); *United States v. Patillo*, No. 222CR00057JCMNJK, 2024 WL 709225 (D. Nev. Feb. 21, 2024) (Judge James Mahan); *United States v. Aguilar-Cruz*, No. 4:23-CR-06024-MKD, 2024 WL 2064053 (E.D. Wash. May 8, 2024) (Judge Mary Dimke); *United States v. Cao*, No. CR22-0028JLR, 2024 WL 1533888 (W.D. Wash. Apr. 9, 2024) (Judge James Robart); *United States v. McReynolds*, No. 2:21-CR-0028-WFN-1, 2024 WL 872974 (E.D. Wash. Feb. 29, 2024) (Judge WM Fremming Nielsen); *United States v. Campbell*, No. 23-5358, 2024 WL 1579390 (W.D. Wash. Apr. 11, 2024) (Judge Benjamin Settle); *United States, v. Branden Johnson, et al.*, No. 2:23-CR-00099-KJM, 2024 WL 4441932 (E.D. Cal. Oct. 8, 2024) (Judge Kimberly Mueller); *United States v. McClain*, No. 2:19-CR-165 WBS, 2024 WL 4455481 (E.D. Cal. Oct. 9, 2024) (Judge William Shubb).  *But see United States v. Hernandez*, No. 1:22-CR-02088-SAB-1, 2024 WL 250782 (E.D. Wash. Jan. 23, 2024) (Judge Stanley Bastian) ("[T]he Court concludes that it can no longer rely on *Vongxay* to answer the question as to whether [Section] 922(g)(1) is constitutional.").

United States District Court
Northern District of California

state militia, and *does not establish an individual right to own or possess firearms for personal or other use*.") (emphasis added).  In 2005, our court of appeals summarily rejected a challenge to the constitutionality of Section 922(g)(1), citing the absence of an individual right to possess arms.  *United States v. Younger*, 398 F.3d 1179, 1192 (9th Cir. 2005).

The Supreme Court revisited the Second Amendment in *District of Columbia v. Heller*.  554 U.S. 570 (2008).  *Heller* rejected the circuits' reading of *Miller* and recognized, for the first time, an *individual* right to keep and bear arms.  At bar were two D.C. statutes: The first banned the possession of handguns in the home, while the second required that any lawful firearm (*e.g.*, long gun) kept in the home be rendered inoperable (through disassembly, a trigger lock, or some other means).  *Heller*'s analysis proceeded in two steps:  *First*, a close reading of the Amendment's text, and *second*, a historical survey of the right as it existed before, at the time of, and shortly after ratification.  *Id.* at 581-92, 605-619.  In view of its text and history, *Heller* held that the prefatory clause of the Second Amendment ("[a] well regulated Militia, being necessary to the security of a free State") did not limit the scope of its operative clause ("the right of the people to keep and bear Arms, shall not be infringed"), which, in turn, guaranteed "the *individual right* to possess and carry weapons in case of confrontation."  *Id.* at 592 (emphasis added).  Both D.C. statutes were invalidated.

While *Heller* declined to "undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment," it recognized that the Second Amendment is not absolute, and enumerated several specific "limitations upon the individual right."  *Id.* at 595, 626.  *Heller*'s limitations included a number of "presumptively lawful regulatory measures[:]"

> [N]othing in our opinion should be taken to cast doubt on *longstanding prohibitions on the possession of firearms by felons* and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id*. at 626-27 (emphasis added).  *Heller* concluded that "[t]he Constitution leaves the District of Columbia a variety of tools for combating that problem, including some measures regulating handguns," citing to the above safe harbor of "presumptively lawful regulatory measures."  *Id*.

at 636. *McDonald v. City of Chicago*, decided shortly after *Heller*, held that the Fourteenth Amendment rendered the Second fully applicable to the states. 561 U.S. 742, 767 (2010).

*Heller*'s recognition of an individual right provoked challenges to all manner of firearm regulations. In reckoning with those post-*Heller* challenges, our court of appeals adopted a two-step analysis. "Under that framework, we first looked to history to determine whether the challenged law burdens conduct protected by the Second Amendment. If so, we then applied a means-end scrutiny based on the extent to which the law burdens the core of the Second Amendment right." *United States v. Alaniz*, 69 F.4th 1124, 1127 (9th Cir. 2023) (internal quotation marks, citations omitted). Our circuit first adopted the means-end scrutiny framework in 2013. *See United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013).

In 2023, the Supreme Court addressed this "two-step" analysis and deemed it "one step too many." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 18 (2022). *Bruen* clarified that text and tradition are the "only" means to justify a firearm regulation:

> Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.
>
> [. . . .]
>
> In sum, the Courts of Appeals' second step is inconsistent with *Heller*'s historical approach and its rejection of means-end scrutiny. We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

*Id*. at 19, 24. *Bruen*'s history and tradition test first asks "whether the challenger is part of the people whom the Second Amendment protects, whether the weapon at issue is in common use today for self-defense, and whether the proposed course of conduct falls within the Second Amendment." *Alaniz*, 69 F.4th at 1128 (internal quotation marks omitted). If so, the

United States District Court
Northern District of California

7

government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Ibid.* (internal quotation marks, citations omitted).

In short, *Bruen* reversed the circuits' post-*Heller* application of means-end scrutiny and "made the constitutional standard endorsed in *Heller* more explicit." *Bruen*, 597 U.S. 1, 31 (2022). The Supreme Court further clarified and applied the *Bruen* test in *United States v. Rahimi*, which rejected a constitutional challenge to Section 922(g)(8).

### B. VONGXAY'S *APPLICATION OF* HELLER *SURVIVES* BRUEN.

In *Vongxay*, our court of appeals heard and rejected the argument that *Heller* rendered Section 922(g)(1) unconstitutional. 594 F.3d 1111 (9th Cir. 2010). *Vongxay* was decided in 2010, two years after *Heller* and *three years before our circuit's adoption of the means-end scrutiny framework set aside by Bruen*. *See United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013) (adopting the two-step framework later abrogated in *Bruen*). *Vongxay* held that "[n]othing in *Heller* can be read legitimately to cast doubt on the constitutionality of § 922(g)(1)," citing *Heller*'s classification of "longstanding prohibitions on the possession of firearms by felons" as "presumptively lawful regulatory measures" available to the state. *Vongxay*, 594 F.3d at 1114-15. *Vongxay* then turned to history, as required by *Heller* (and later *Bruen*), and concluded that "most scholars of the Second Amendment agree that the right to bear arms was inextricably tied to the concept of a virtuous citizenry that would protect society through defensive use of arms against criminals, oppressive officials, and foreign enemies alike, and that the right to bear arms does not preclude laws disarming the unvirtuous citizens (*i.e.* criminals)." *Id.* at 1118. *Vongxay* "did not reference, let alone employ, the 'means-end' scrutiny that *Bruen* rejected." *United States v. Duarte*, 101 F.4th 657, 694 (9th Cir.) (Smith, J., dissenting), *reh'g en banc granted, opinion vacated*, 108 F.4th 786 (9th Cir. 2024).

*Vongxay* applied *Heller*, itself undisturbed by *Bruen*. That *Bruen* abrogated the later-adopted means-end scrutiny framework is irrelevant. The Eleventh Circuit came to a similar conclusion regarding its own circuit precedent. In 2010, *United States v. Rozier* denied a post-*Heller* challenge to Section 922(g)(1), reasoning, like *Vongxay*, that *Heller*'s safe harbor

1    rendered felon-in-possession statutes constitutional.  598 F.3d 768 (11th Cir. 2010).  When

2    asked to set aside *Rozier* in light of *Bruen*, the Eleventh Circuit declined:  *Bruen* disapproved

3    of means-end scrutiny and urged a return to *Heller*, which *Rozier* had faithfully applied.

4    *United States v. Dubois*, 94 F.4th 1284, 1292 (11th Cir. 2024).  The same is true here.

5    *Vongxay* remains good law and forecloses on defendant's challenge.

6            Defendant's counters cut no figure.

7            *First*, defendant argues that *Heller*'s list of presumptively lawful regulatory measures is

8    mere dicta that should not be used to "sidestep" *Bruen*'s analysis.  "[I]t is inconceivable that

9    the Court in *Heller*," defendant says, "would so cavalierly do away with the required historical

10   analysis for a major firearm regulation" (Dkt. No. 64 at 1).  All *Heller* meant to say, he argues,

11   is that "its recognition of an individual Second Amendment right does not automatically

12   invalidate all firearm regulations" (*ibid.*).

13           Defendant's assertion that *Heller* did not provide safe harbor to those regulations

14   identified as "presumptively lawful" runs headlong into *Heller* itself.  There, the Supreme

15   Court explained:  "Although we do not undertake an exhaustive historical analysis today of the

16   full scope of the Second Amendment, *nothing in our opinion should be taken to cast doubt on*

17   longstanding prohibitions on the possession of firearms by felons . . . ."  *Heller*, 554 U.S. at

18   627 (emphasis added).

19           Justice Alito reiterated that point in the principal opinion in *McDonald*:

20
21           *We made it clear in Heller that our holding did not cast doubt on*
             *such longstanding regulatory measures as "prohibitions on the*
22           *possession of firearms by felons"* and the mentally ill," "laws
             forbidding the carrying of firearms in sensitive places such as
23           schools and government buildings, or laws imposing conditions
             and qualifications on the commercial sale of arms."  We repeat
24           those assurances here.  *Despite municipal respondents' doomsday*
             *proclamations, incorporation does not imperil every law*
25           *regulating firearms.*

26   *McDonald*, 561 U.S. at 786 (citations omitted; emphasis added).  Defendant's demand — that

27   the Court reconsider the constitutionality of Section 922(g)(1) — cannot be squared with the

28   Supreme Court's repeated assurances that nothing in *Heller* "cast doubt on" or "imperil[ed]"

United States District Court
Northern District of California

longstanding prohibitions on the possession of firearms by felons.  *Heller*, 554 U.S. at 627; *McDonald*, 561 U.S. at 786.

Turning now to defendant's attempt to reduce *Heller*'s safe harbor to dicta, *Vongxay* itself considered and rejected that argument:

> Vongxay nevertheless contends that the Court's language about certain long-standing restrictions on gun possession is dicta, and therefore not binding.  We disagree.  Courts often limit the scope of their holdings, and such limitations are integral to those holdings. Indeed, legal rulings in a prior opinion are applicable to future cases only to the degree one can ascertain from the opinion itself the reach of the ruling.

*Vongxay*, 594 F.3d at 1115 (internal quotation marks, alterations, citations omitted).

In *Bruen*, six justices reaffirmed the continued vitality of *Heller*'s safe harbor.  Justice Kavanaugh, joined by the Chief Justice, reiterated that "[p]roperly interpreted, the Second Amendment allows a 'variety of gun regulations,'" and quoted *Heller*'s safe harbor directly: "[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill."  *Bruen*, 597 U.S. at 80-81 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 81).  Justice Alito, meanwhile, wrote:  "Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun . . . . Nor have we disturbed anything we said in *Heller* . . . about restrictions that may be imposed on the possession or carrying of guns."  *Id.* at 72 (Alito, J., concurring).  Justice Breyer's dissent, joined by Justices Kagan and Sotomayor, again stated that *Bruen* "cast[s] no doubt on" *Heller*'s identification of prohibitions on the possession of firearms by felons as "presumptively lawful."  *Id.* at 129 (Breyer, J., dissenting).

And again, in the principal opinion in *Rahimi*:

> The Court's decisions in *Heller* and *Bruen* do not help Rahimi. While Section 922(g)(8) bars individuals subject to restraining orders from possessing guns in the home, *Heller never established a categorical rule that the Constitution prohibits regulations that forbid firearm possession in the home.  Indeed, Heller stated that many such prohibitions, like those on the possession of firearms by "felons and the mentally ill," are "presumptively lawful."*

United States District Court
Northern District of California

144 S. Ct. at 1891.

Our court of appeals' post-*Bruen* cases have likewise continued to endorse *Heller's* safe harbor:

> The Supreme Court has repeatedly emphasized, however, that "the right secured by the Second Amendment is not unlimited" . . . . In particular, the Court has recognized a historical tradition of disarming individuals who are not "law-abiding, responsible citizens." To that end, *Heller* specifically identified "longstanding prohibitions on the possession of firearms by felons and the mentally ill" as non-exhaustive "examples" of "presumptively lawful regulatory measures."

*United States v. Perez-Garcia*, 96 F.4th 1166, 1177-78 (9th Cir. 2024) (quoting *Heller*, 554 U.S. at 626, 627 n.26, 635) (citations omitted).

*Second*, defendant argues that *Heller's* list of "presumptively lawful regulations" provides no safe harbor from *Bruen* because that decision itself subjected two such regulations to historical analysis (Dkt. No. 60 at 6). "Prohibitions on carrying concealed weapons" and "laws forbidding the carrying of firearms in sensitive places" were both among *Heller's* list of presumptively lawful regulatory measures. 554 U.S. at 626-27. "Yet, far from placing New York's concealed-carry prohibition above constitutional scrutiny, the Supreme Court undertook a full textual and historical analysis, then struck down the law," defendant argues (Dkt. No. 60 at 6). Likewise, "when New York tried to invoke *Heller's* sensitive-places exception, the Court demanded a basis for that comparison in the 'historical record.' When New York could not provide one, this [*sic*] Court rejected New York's argument" (*ibid.*).

Defendant mischaracterizes the issues considered in *Bruen*. As to the first, *Bruen* did not relitigate the constitutionality of "prohibitions on carrying concealed weapons." As Justice Kavanaugh noted in concurrence: "The Court's decision addresses only the unusual discretionary licensing regimes, known as 'may-issue' regimes, that are employed by 6 States including New York." *Bruen*, 597 U.S. at 79 (Kavanaugh, J., concurring). "May issue" licensing regimes, which impose an affirmative showing upon license applicants, were not included in *Heller's* safe harbor. As to "laws forbidding the carrying of firearms in sensitive

places," *Bruen* reaffirmed the continued legitimacy of such regulatory measures ("we are aware of no disputes regarding the lawfulness of such prohibitions"), and "assume[d] it settled that these locations [legislative assemblies, polling places, and courthouses] were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *Bruen*, 597 U.S. at 30. *Bruen* took issue only with the respondents' attempt to proclaim *the island of Manhattan* a "sensitive place" *in toto*. *Id*. at 31.

*Third*, defendant argues that *Vongxay*'s reasoning is irreconcilable with both *Heller* and *Bruen* because it relied on *Younger* and other pre-*Heller* decisions (Dkt. No. 60 at 7). Our court of appeals rejected that argument six years after *Vongxay* was decided:

> Phillips argues that *Vongxay* is not good law. He contends that it conflicted with circuit precedent when it relied, in part, on *United States v. Younger*, 398 F.3d 1179 (9th Cir. 2005), a pre-*Heller* case that held that there is no individual right to bear arms under the Second Amendment. *See Vongxay*, 594 F.3d at 1116. But *Vongxay* acknowledged *Heller*'s holding — that there is an individual right under the Second Amendment — notwithstanding the panel's assertion that it was "still bound by *Younger*." . . . .
>
> If the panel had truly considered itself bound by *Younger* in all respects, it would not have analyzed the Second Amendment question at all, since there would have been no claim to an individual right. If Phillips believes that *Vongxay* is inconsistent with *Heller*, his remedy in this court is to seek rehearing en banc.

*United States v. Phillips*, 827 F.3d 1171, 1174 n.1 (9th Cir. 2016).

\*                    \*                    \*

Defendant is right that *Vongxay* did not apply the exact methodology handed down in *Bruen*. It need not have. "[A]s long as we can apply our prior circuit precedent without running afoul of the intervening authority, we must do so . . . . The intervening higher precedent must be *clearly inconsistent* with the prior circuit precedent." *Lair*, 697 F.3d at 1207 (internal quotation marks, citations omitted; emphasis added). *Vongxay*'s application of *Heller* is not "clearly inconsistent with" *Bruen*, a decision that reiterated, time and again, that *Heller* remains good law.

Defendant advances several additional arguments that take issue with *Vongxay* on its own terms, asserting, in essence, that the decision was not sufficiently rigorous and misread *Heller*. Those arguments do not warrant discussion here. It is not for the district court to decide whether binding precedent is well-reasoned, only whether it has been abrogated by intervening authority. Here, it has not.

### 2. THE *BRUEN* TEST.

Even if *Vongxay* did not control, defendant's challenge would fail *Bruen*.

*Bruen* first required courts to determine "whether the challenger is part of the people whom the Second Amendment protects, whether the weapon at issue is in common use today for self-defense, and whether the proposed course of conduct falls within the Second Amendment." *Alaniz*, 69 F.4th at 1128 (internal quotation marks omitted). If so, the burden shifts to the government, who "must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Ibid.* (internal quotation marks, citations omitted).

#### A. DEFENDANT AND HIS CONDUCT ARE PRESUMED TO FALL WITHIN THE AMBIT OF THE SECOND AMENDMENT.

It is uncertain whether defendant is among "the people." In *Heller*, the Supreme Court defined "the people" as "a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." 544 U.S. at 580 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). *Heller* elsewhere stated that the Second Amendment right "is exercised individually and belongs to all *Americans*." *Ibid.* (emphasis added). *Rahimi*, too, stated that the Second Amendment "secures for *Americans* a means of self-defense." *Rahimi*, 144 S. Ct. at 1897. Those unlawfully present, like defendant, "are neither citizens nor members of the political community." *United States v. Singh*, 979 F.3d 697 (9th Cir. 2020). Defendant cannot vote, hold government office, or serve on a jury. His connections with this country, if any, are minimal. That being said, any attempt to plot out the boundaries of the "people" raises difficult questions beyond the Second Amendment, and our court of appeals has consistently

declined to go there.  *Id*. at 925.  This order likewise "assume[s] (without deciding) that the Second Amendment extends to unlawful aliens."  *United States v. Torres*, 911 F.3d 1253, 1257 (9th Cir. 2019).  The remainder of *Bruen*'s threshold inquiry warrants little discussion.  There is no doubt that the weapon at issue, pistol ammunition, and the course of conduct, possession, fall within the ambit of the Second Amendment.

### B.    THE NATION'S HISTORICAL TRADITION.

We now reach the heart of the *Bruen* test:  a survey of "historical precedent from before, during, and even after the founding" for evidence of "a comparable tradition of regulation."  597 U.S. at 27 (internal quotation marks omitted).  As our court of appeals recently explained:

> The 'central' consideration in this analysis is whether, when compared to a modern regulation, the historical precedent imposed a '*comparable burden*' on the right of armed self-defense and was '*comparably justified*.'  In other words, both the modern regulation and the historical precedent must align as to 'how and why [they] burden a law-abiding citizen's right to armed self-defense.'"

*United States v. Perez-Garcia*, 96 F.4th 1166, 1181 (9th Cir. 2024) (quoting *Bruen*, 597 U.S. at 29) (citations omitted; alterations in original; emphasis added).  "[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*.  So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster."  *Bruen*, 597 U.S. at 30.

*Rahimi*, the Supreme Court's latest word on all this, is most instructive.  *United States v. Rahimi*, 144 S. Ct. 1889 (2024).  There, the Supreme Court rejected a challenge to the constitutionality of Section 922(g)(8), which prohibits the possession of firearms by persons subject to a domestic violence restraining order.  *Rahimi* held that Section 922(g)(8) "fits comfortably" in a longstanding tradition of "preventing individuals who threaten physical harm to others from misusing firearms."  *Id*. at 1897.  The Chief Justice's principal opinion cited two historical analogues:  surety laws and "going armed" laws.  The first, a form of "preventative

United States District Court
Northern District of California

justice," "authorized magistrates to require individuals suspected of future misbehavior to post a bond.  If an individual failed to post a bond, he would be jailed.  If the individual did post a bond and then broke the peace, the bond would be forfeit."  *Id.* at 1900.  "[S]urety laws could be invoked to prevent all forms of violence, including spousal abuse" and "the misuse of firearms."  *Ibid*.  The second analogue, "going armed laws," "prohibited riding or going armed, with dangerous or unusual weapons, to terrify the good people of the land," and punished violators with "forfeiture of the arms . . . and imprisonment."  *Id.* at 1901 (cleaned up).  The Supreme Court held that:

> "Taken together, the surety and going armed laws confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed.  Section 922(g)(8) is by no means identical to these founding era regimes, but it does not need to be.  Its prohibition on the possession of firearms by those found by a court to present a threat to others fits neatly within the tradition the surety and going armed laws represent."

*Ibid*.

With *Rahimi*'s analysis in mind, this order turns to the government's proffered historical analogues:  laws that punished felons with capital punishment and estate forfeiture.  *First*, this order will survey historical precedent to determine whether the proffered analogue is "well-established and representative."  *Bruen*, 597 U.S. at 30.  The Second Amendment "codified a right inherited from our English ancestors," and this analysis will cover statutes *first* in the English code, *second* during the colonial period, and *third* at the nation's founding.  *Heller*, 554 U.S. at 599.  *Second*, Section 922(g)(1) will be compared to those analogues to determine whether the latter "imposed a *comparable burden* on the right of armed self-defense and was *comparably justified*."  *Perez-Garcia*, 96 F.4th at 1181 (cleaned up).

### (i) Laws punishing felonies with death and estate forfeiture are well-established, representative historical analogues.

*First*, English law punished a broad swathe of crimes — including smuggling, fraudulent bankruptcy, violating quarantine, and forging a marriage license — with death (Dkt. No. 63 at 13) (citing 4 William Blackstone, *Commentaries on the Laws of England*, 155-163).  Entry of

United States District Court
Northern District of California

United States District Court
Northern District of California

"judgment of death or outlawry" also triggered forfeiture of the convict's "real estates . . . goods and chattels."  Blackstone, *supra*, 379.  "Forfeiture was a part of the punishment of the crime . . . by which the goods and chattels, lands and tenements of the attainted felon were forfeited to the king; the former absolutely on conviction, and the latter perpetually, or during the life of the offender, on sentence being pronounced."  *Avery v. Everett*, 110 N.Y. 317, 324 (1888).  Estate forfeiture was one aspect of a broader "civil death" that accompanied felony convictions:  "The incident of civil death attended every attainder of treason or felony, whereby . . . [the convicted] is disqualified from being a witness, can bring no action, nor perform any legal function; he is in short regarded as dead in law."  *Id*. at 324 (citations and internal quotation marks omitted).  England expanded its application of capital punishment throughout the seventeenth and eighteenth centuries, with some authorities counting close to 200 capital crimes by the reign of the tyrant King George.  Robert M. Bohm, *DeathQuest, An Introduction to The Theory and Practice Of Capital Punishment In The United States*, 2 (5th ed., 2016).

*Second*, the American colonies imported and applied the metropole's "bloody code."  "Massachusetts [Bay Colony] made robbery a capital crime upon a third conviction in 1642, upon a second in 1711, and upon a first in 1761."  Stuart Banner, *The Death Penalty:  An American History*, 7-8 (2003).  "New Hampshire reduced the number of burglary convictions necessary for the death penalty from three to two in 1682, and then to one in 1718."  *Id* at 8.  Pennsylvania made burglary, highway robbery, arson, witchcraft, sodomy, and counterfeiting capital crimes, while New York added piracy, counterfeiting, and perjury.  *Ibid*.  Other colonies went further still:

> Virginia imposed the death penalty for all sorts of crimes relating to the tobacco trade —  including embezzling tobacco, fraudulently delivering tobacco, altering inspected tobacco, forging inspectors' stamps, and smuggling tobacco —  as well as for stealing hogs (upon a third conviction), receiving a stolen horse, and concealing property to defraud creditors.  Delaware made it a capital offense to steal £5 from a house, *and then imposed the death penalty upon the third conviction of any theft, regardless of location or amount*.  South Carolina copied the English statute providing death for those convicted of burning the timber intended for house frames.

*Ibid.*

Capital sentences were sometimes commuted. In 1739, for example, Pennsylvania's governor commuted the death sentences of two women convicted of burglary on account of their penitence and old age, on condition that they be banished instead. 4 *Colonial Records of Pennsylvania*, 329-330 (1851). Even in cases of such mercy, capital punishment remained the norm from which other sanctions deviated.

The colonies' criminal codes contained myriad other sentences that, while short of death or total estate forfeiture, imposed permanent consequences upon the convicted. A 1722 Pennsylvania law, for example, provided that anyone convicted of counterfeiting a bill of credit "shall be set upon the pillory in some open public place, *and there have both his or her ears cut off,* and be publicly whipped on his or her bare back with thirty-one lashes, *well laid on.*" 3 *The Statutes at Large of Pennsylvania from 1682 to 1801*, 331 (James Tyndale Mitchell, ed., 1896). various fines and costs were then levied against the earless offender for good measure. Mutilation, branding, castration, and boring with hot irons occurred throughout the colonies.

*Third*, "[d]eath was the standard penalty for all serious crimes" in the Founding era. *Bucklew v. Precythe*, 587 U.S. 119, 129 (2019) (internal quotation marks omitted). "At the time of the Second Amendment's ratification, for example, nonviolent crimes such as forgery and horse theft were capital offenses." *Perez-Garcia*, 96 F.4th at 1183. "Shortly after proposing the Bill of Rights," the First Congress passed laws punishing "forgery of United States securities, running away with a ship or vessel, or any goods or merchandise to the value of fifty dollars, treason, and murder on the high seas with the same penalty: death by hanging. The law books of the time are devoid of indication that anyone considered these newly enacted penalties unconstitutional by virtue of their disproportionality." *Harmelin v. Michigan*, 501 U.S. 957, 980 (1991) (cleaned up). States followed suit: A 1788 New York statute, for example, mandated capital punishment upon a second conviction for theft of chattels worth over five pounds. Act of Feb. 21, 1788, ch. 37, *1788 N.Y. Laws*, 665. Penalties naturally varied by state and across time. In New Jersey, for example, horse theft, initially a capital

1    offense, was made non-capital in 1769, capital in 1780, and reverted back to non-capital a few

2    years later.  William Bradford, *An Enquiry How Far the Punishment of Death is Necessary in*

3    *Pennsylvania*, 11 (1793).  That being said, records are "full of inmates escaping after being

4    sentenced to death."  Banner*, supra*, at 17, 18.  "Ministering to those condemned to death was

5    so routine that in 1791 William Smith could publish a guidebook for ministers" tending to the

6    spiritual needs of the condemned before execution.  *Id.* at 18.

7         Estate forfeiture also continued to accompany a wide swathe of convictions in early

8    America, including, for example, counterfeiting and embezzlement of wills or records.  Beth

9    A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 n. 275, 276 (2014)

10   (collecting statutes).  Virginia's counterfeiting statute is illustrative:

11              [I]f any person within this commonwealth shall forge or
             counterfeit, alter or erase, any certificate of money . . . every
12           person so offending, and being lawfully convicted, *shall forfeit his*
             *whole estate, real and personal* . . . and shall be obliged to serve on
13           board some armed vessel . . . without wages, not exceeding seven
             years.
14

15   Act of May 5, 1777, ch. 5, § 4, 9 *Virginia Statutes at Large*, at 286, 287 (William Waller

16   Hening ed., 1821) (emphasis added).  Pennsylvania likewise required counterfeiters to "forfeit

17   all . . . goods and chattels."  Act of Nov. 26, 1779, § 2, 10 *Statutes at Large of Pennsylvania*, at

18   12, 15–16 (James T. Mitchell & Henry Flanders eds., 1904).  Pennsylvania also punished

19   convictions of "robbery, burglary, sodomy or buggery" with forfeiture.  Act of Apr. 5, 1790,

20   13 *Statutes at Large of Pennsylvania*, at 511–12 (James T. Mitchell & Henry Flanders eds.,

21   1896).

22        *Finally*, non-statutory evidence from the Founding suggests that Americans understood

23   criminals to have forfeited the right to bear arms.  "[M]ost scholars of the Second Amendment

24   agree that the right to bear arms was inextricably tied to the concept of a virtuous citizenry and

25   that . . . the right to bear arms does not preclude laws disarming the unvirtuous citizens (i.e.

26   criminals)."  *Vongxay*, 594 F.3d at 1118 (cleaned up).  "Felons simply did not fall within the

27   benefits of the common law right to possess arms. . . . Nor does it seem that the Founders

28   considered felons within the common law right to arms or intended to confer any such right

United States District Court
Northern District of California

upon them. *All the ratifying convention proposals which most explicitly detailed the recommended right-to-arms amendment excluded criminals and the violent.*"  Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 266 (1983).  Pennsylvania's "highly influential" "Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents," for example, proposed:

> That the people have a right to bear arms for the defense of themselves and their own state, or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them, *unless for crimes committed*, or real danger of public injury from individuals.

2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 665 (1971);  *Heller*, 554 U.S. at 603, 605.  William Rawle, Pennsylvania's U.S. Attorney from 1791 to 1800, supported a broader right to bear arms than existed in England, but nevertheless emphasized that the right "ought not . . . be abused to the disturbance of the public peace."  William Rawle, *A View of the Constitution of the United States of America* 126 (Philadelphia 1829); *Heller*, 554 U.S. at 593.  The Anti-Federalist delegates to the Massachusetts convention, led by Samuel Adams, proposed that "the said Constitution be never construed to authorize Congress to . . . prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms."  *Id*. at 662, 665.  The New Hampshire convention proposed that Congress "shall never" disarm the citizenry unless they "are or have been in actual rebellion."  1 Jonathan Elliott, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution*, 326 (2d ed. 1891).

These particular articulations of the outer bounds of the Second Amendment never made their way into the law books.  As *Heller* explained, however, "the Bill of Rights codified venerable, widely understood liberties," and it is unlikely that "different people of the founding period had vastly different conceptions of the right to keep and bear arms."  554 U.S. at 604-05 (2008).  The statements above are relevant insofar as they illustrate the limitations ascribed to the right by the Americans that helmed the early Republic's legal and legislative institutions.

In sum, the historical record reflects a long and well-established tradition of punishing felons, including those convicted of burglary, theft, and similar "non-violent" offenses, with permanent forfeitures of life, limb, and property.

### (ii) *Section 922(g)(1) is relevantly similar to laws imposing death and estate forfeiture on felons.*

Section 922(g)(1)'s permanent disarmament of convicted felons is "relevantly similar" to the founding era tradition of capital punishment and estate forfeiture. Historical precedents are "relevantly similar" to the regulation at bar, if, *first*, they imposed a "comparable burden on the right of armed self-defense," and *second*, that burden was "comparably justified." *Perez-Garcia*, 96 F.4th at 1181 (internal quotation marks, citations omitted). "In other words, both the modern regulation and the historical precedent must align as to how and why they burden a law-abiding citizen's right to armed self-defense." *Ibid.* (cleaned up). Both are true here.

*First*, the analogues above imposed a comparable burden on the right to bear arms. Section 922(g)(1) permanently burdens offenders' rights, as did the historic practice of capital punishment, estate forfeiture, and disfiguration. *Rahimi* held that "if imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that § 922(g)(8) imposes is also permissible." *Rahimi*, 144 S. Ct. at 1902. Here, if death, mutilation, and estate forfeiture were permissible responses to convictions for theft, burglary, and myriad other crimes, the lesser restriction of permanent disarmament imposed by Section 922(g)(1) is also permissible. *See Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019) ("[I]t is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms."). Like the imposition of capital punishment and estate forfeiture, Section 922(g)(1) applies only to individuals who have been duly convicted of a serious crime. *Rahimi*, 144 S. Ct. at 1901.

*Second*, the historical precedents above were comparably justified. Capital punishment and estate forfeiture served to punish wrongdoers, deter further wrongdoing, and protect the citizenry from lawlessness (Dkt. No. 63 at 15). Banner, *supra*, 12-15. The same is true of

United States District Court
Northern District of California

Section 922(g)(1).  On May 23, 1968, Louisiana Senator Russell Long, the sponsor of what

would become Section 922(g), explained on the senate floor:

> While we may be willing for a citizen to have a gun for the defense
> of his home — and I certainly have no objection to it — we do not
> want the murderers, the burglars, the rapists, the looters, or the
> arsonists armed to the teeth and walking the streets. We do not
> want the habitual criminals who have committed all sorts of crimes
> armed and presenting a hazard to law-abiding citizens.

*Stevens v. United States*, 440 F.2d 144, 155 (6th Cir. 1971).  Senator Long counted felons

among those "persons who, by their actions, have demonstrated that they are dangerous *or that*

*they may become dangerous*.  Stated simply, they may not be trusted to possess a firearm

without becoming a threat to society." *Id*. at 160 (emphasis added).

Section 922(g)(1) "fits comfortably" within a historical tradition of permanently

punishing those convicted of serious crimes, including non-violent felonies, as a means of

deterring future misbehavior and ensuring the safety of the law-abiding public.  Section

922(g)(1) "is by no means identical to these founding era regimes, but it does not need to

be." *Rahimi* 144 S. Ct. at 1902.  Section 922(g)(1)'s disarmament of convicted felons is

"relevantly similar" to the founding era regulatory framework in both "how and why the

regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29.

### (iii)    *Application to the defendant.*

This order now turns to defendant, who has four prior convictions, two of them for felony

second-degree burglary.  Under California law, second-degree burglary encompasses all

species of burglary (entering a building, room, or other qualifying structure or vehicle with the

intent to commit grand/petit larceny or any other felony) except (1) burglary of an inhabited

dwelling (first degree burglary) and (2) the entering of a commercial establishment during

regular business hours with the intent to take property valued at or under $950 (misdemeanor

shoplifting).  Cal. Penal Code §§ 459, 459.5, 460.  As explained above and below, multiple

convictions of theft and other "non-violent" property crimes often resulted in a capital sentence

or estate forfeiture.  The sources discussed herein support a historical tradition of harsh,

1    permanent punishment of individuals with records relevantly similar to (and often falling short

2    of) defendant's own.

3        Section 922(g)(1) is constitutional as applied to defendant.  His facial challenge must also

4    fail.  *United States v. Salerno*, 481 U.S. 739, 746 ("A facial challenge to a legislative Act is, of

5    course, the most difficult challenge to mount successfully, since the challenger must establish

6    that no set of circumstances exists under which the Act would be valid.").

7                    *            *            *

8        Defendant's arguments to the contrary are not persuasive.

9        *First*, defendant attempts to distinguish the historical precedents above from Section

10   922(g)(1).  He objects, for example, to the *a fortiori* argument regarding the imposition of

11   capital sentences and estate forfeiture.  But that very mode of reasoning underpinned the

12   Supreme Court's holding in *Rahimi*. 144 S. Ct. at 1901-02 ("[I]f imprisonment was permissible

13   to respond to the use of guns to threaten the physical safety of others, then the lesser restriction

14   of temporary disarmament that Section 922(g)(8) imposes is also permissible.").  Defendant

15   next takes issue with the fact that the historical precedents considered are not felon-

16   disarmament statutes.  Again, *Rahimi* explained that *Bruen* required "historical analogues," not

17   "historical twins."  *Rahimi*, 144 S. Ct. at 1903.  Surety laws and "going armed" laws did not

18   prohibit possession of arms by those subject to a protective order, as does Section 922(g)(8).

19   The first did not disarm individuals whatsoever:  Those subject to a bond needed only to post

20   it, those in violation forfeited it.  The second, meanwhile, prohibited menacing of the "good

21   people of the land" "with dangerous or unusual weapons," and had little to do with a perceived

22   threat to one's own "intimate partner . . . or child of such intimate partner."  *Rahimi*, 144 S. Ct.

23   at 1900-01; 18 U.S.C. § 922(g)(8).  "Section 922(g)(8) is by no means identical to these

24   founding era regimes, but it does not need to be."  *Rahimi*, 144 S. Ct. at 1901.  It is likewise

25   immaterial that not every precedent above punished defendant's "particular prior convictions"

26   with death or estate forfeiture (Dkt. No. 60 at 13).  As an initial matter, several laws *did* impose

27   capital punishment upon multiple convictions of theft.  But again, neither historical analogue at

28   issue in *Rahimi* disarmed an individual because he posed a risk to his intimate partner or child.

United States District Court
Northern District of California

Section 922(g)(1) need not be *identical* to founding era regimes, it is enough that it is *relevantly similar*.

    *Second*, defendant asserts that Section 922(g)(1) fails as applied to him because his prior felony convictions, "as defined by their elements, do not require violence or risk of violence" (Dkt. No. 64 at 11). As an initial matter, defendant's underlying presumption — that some burglaries do not present a risk of violence — is wrong. It is a matter of common sense that burglary — in *any* degree — "pose[s] substantial risks of confrontation that can lead to immediate violence" (Dkt. No. 64 at 11). More so if the burglar is armed. *Rahimi*'s reference to "clear threat[s] of physical violence to another," moreover, cannot be divorced from its analysis of Section 922(g)(8) and made to stand as a general limitation on firearm regulations. Whether or not Section 922(g)(1), at issue here, unconstitutionally burdens defendant's Second Amendment right must be decided with reference to the historical analogues above.

    Laws imposing capital punishment and estate forfeiture did not treat the degree of violence accompanying the underlying act as determinative of sentence severity. Myriad non-violent crimes were punished by execution and estate forfeiture. A 1633 Massachusetts judgment, for example, punished theft of corn, fish, and sideboards with forfeiture of the convict's estate, whipping, and three years' servitude. 2 *Records of the Court of Assistants of the Colony of the Massachusetts Bay 1630–1692*, at 32 (John Noble ed., 1904). Ten years later, Massachusetts condemned two adulterers to die. *Id.* at 139 (sentencing adulterers James Brittaine and Mary Latham to death). In 1731, a Pennsylvania woman was "drawn and burnt" for petit treason. Pennsylvania Gazette (Sept. 23, 1731). John Whitney, a member of a "gang of notorious thieves," was executed by public hanging in Fredericksburg, Virginia, on January 21, 1774. Banner, *supra*, at 10. Delaware Colony imposed the death penalty upon a third conviction of *any* theft, *regardless of location or amount*. Virginia Colony imposed the death penalty for stealing hogs (upon a third conviction), receiving a stolen horse, and concealing property to defraud creditors. In New York State, meanwhile, the death penalty accompanied a second conviction for theft of chattels valued over five pounds. Act of Feb. 21, 1788, ch. 37, 1788 N.Y. Laws 664–65.

United States District Court
Northern District of California

The "benefit of the clergy" further illustrates the point. The practice, inherited from the English, served as a mechanism for the exercise of leniency. States deemed certain felonies "clergyable," and others "unclergyable." A prisoner convicted of a clergyable felony punishable by death could "plead his clergy," which had the effect of reducing his sentence from death to mere branding. Kathryn Preyer, *Crime, the Criminal Law and Reform in Post-Revolutionary Virginia*, 1 L. and History Rev., 53, 54 (1983). A convict could invoke the benefit only once: Anyone who pled his clergy to a felony punishable by death would find no further quarter should he be subsequently convicted of any other capital offense. *Ibid*. "The long history of benefit of clergy shows innumerable statutes enacted that made certain crimes clergyable or non-clergyable and the status could change, depending on the degree to which legislative bodies perceived the need for a harsher or more lenient criminal code." *Ibid*. Whether or not a crime was deemed clergyable had little to do with the degree of violence at issue. For example, "[i]n 1792 [Virginia], burglary, arson at common law, burning of a court house, robbery, *theft and forgery* were made *unclergyable*; malicious shooting, stabbing, maiming and disfiguring were made felonies, although apparently *clergyable*." *Id*. at 73 (emphasis added). Nothing suggests that the severity of a sentence flowed from the degree of violence inherent in the offense.

In sum, the historical precedents above extended to all manner of crimes, not only "crimes of violence." Defendant provides no reason why Section 922(g)(1) must be so limited.

*           *           *

This order turns now to the vacated panel decision in *Duarte*. 101 F.4th 657 (9th Cir.), *reh'g en banc granted, opinion vacated*, 108 F.4th 786 (9th Cir. 2024). "[A] decision that has been vacated has no precedential authority whatsoever." *Marley v. United States*, 567 F.3d 1030, 1038 (9th Cir. 2009) (internal citation omitted). Defendant has nevertheless adopted *Duarte*'s analysis *in toto*, and argues that this order should, too.

The *Duarte* panel did not have the benefit of *Rahimi*'s clarification of *Bruen*. *Rahimi* recognized that "some courts have misunderstood the methodology" of *Heller* and *Bruen* and emphasized that the Second Amendment is not "a law trapped in amber," and "permits more

than just those regulations identical to ones that could be found in 1791." *Rahimi*, 144 S. Ct. at 1897-98.

The *en banc* rehearing in *Duarte* will be our court of appeals' first opportunity to weigh in on the constitutionality of Section 922(g)(1) post-*Rahimi*. The First, Third, Sixth, and Eighth Circuits have already had occasion to do so: All have held that the regulation passes muster. *See United States v. Langston*, 110 F.4th 408 (1st Cir. 2024); *United States v. Moore*, 111 F.4th 266 (3d Cir. 2024); *United States v. Williams*, 113 F.4th 637 (6th Cir. 2024); *United States v. Jackson*, 110 F.4th 1120, 1128 (8th Cir. 2024). This order agrees with the growing consensus among our sister circuits.

## CONCLUSION

For the foregoing reasons, defendant's motion is **DENIED**.

**IT IS SO ORDERED.**

Dated: November 12, 2024.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE